BOND PURCHASE, L.L.C., Plaintiff,

v.

PATRIOT TAX CREDIT PROPER-
TIES, L.P. and RCC PARTNERS
96, L.L.C., Defendants.

C.A. No. 16643.

Court of Chancery of Delaware,
New Castle County.

Submitted: Feb. 5, 1999.
Decided: July 23, 1999.

Craig B. Smith and Robert J. Katzenstein of Smith, Katzenstein & Furlow, Wilmington, Delaware, for Plaintiff.

Gregory V. Varallo and Kelly A. Herring of Richards, Layton & Finger, Wilmington, Delaware; Joel S. Weiss, Mark Walfish and Adrienne B. Koch of Esanu Katsky Korins & Siger, New York City, of counsel, for Defendants.

## O P I N I O N

STEELE, Vice Chancellor.

### I. Issues Presented

At issue is whether the defendant limited partnership is required to provide, pursuant to 6 *Del.C.* Section 17–305 and section 14.1 of the limited partnership agreement, the plaintiff, a non-limited partner investor in the defendant through its ownership of Beneficial Unit Certificates ("BUC$") issued by the defendant, with a list of the names and addresses of the defendant's partners and other BUC$ owners. Although the plaintiff's desire to use the list to conduct a mini-tender offer for 4.9% of the defendant's outstanding partnership interests is a "proper purpose" under 6 *Del.C.* Section 17–305(a), plaintiff does not have a statutory right to the list because the defendant's general partner in good faith believes that disclosing the list to the plaintiff is not in the best interest of the defendant. The defendant, therefore, is entitled to deny the plaintiff access to the list under 6 *Del.C.* Section 17–305(b). The plaintiff, however, does have a contractual right to the list under section 14.1 of the partnership agreement, which grants the plaintiff, as a BUC$ owner, the right to inspect, copy or examine the defendant's books and records at all times. In arriving at this result, I conclude that in this instance the term "books and records" as used in section 14.1 includes a list of the defendant's partners and BUC$ owners. I also conclude that this is an instance in which the "improper purpose defense" can be implied as a term of the partnership agreement, but that the defendant has failed to meet its burden to establish the defense in this case. Specifically, the defendant fails to prove that the plaintiff's mini-tender offer in fact would be adverse to the interests of the defendant. Accordingly, for the reasons discussed more fully below, the plaintiff is entitled under the partnership agreement to the relief that it seeks.

### II. Background

#### A. The Parties

Plaintiff Bond Purchase, L.L.C. ("Bond") is a Missouri limited liability company that is an investor in Defendant Patriot Tax Credit Properties, L.P. (the "Partnership"), a Delaware limited partnership, through its ownership of Beneficial Unit Certificates issued by the Partnership. Defendant RCC General Partners 96, L.L.C. (the "General Partner") is a Delaware limited liability company that serves as the Partnership's sole general partner.

#### B. The Partnership

##### (1) The Partnership's Tax Status

The Partnership was formed in 1989. The Partnership is an investment vehicle through which its investors obtain tax benefits in the form of credits and losses. Through its investments in other limited partnerships, the Partnership obtains the tax credits and losses that it then passes on to its investors. The Partnership is able to pass along its tax credits and losses to its investors only because the Partnership is not, under section 7704 of the Internal Revenue Code ("Section 7704"), a "Publicly Traded Partnership."[1] If, however, the Partnership were to meet Section 7704's definition of a Publicly Traded

---

1. I.R.C. § 7704.

Partnership,[2] and not qualify for Section 7704's exception for partnerships with passive-type income [3], the Internal Revenue Service would treat the Partnership as a corporation for federal tax purposes.[4] Treatment as a corporation for federal tax purposes means that the Partnership would not be able to pass on to its investors its tax credits and losses.

The Partnership currently relies on a safe harbor set forth in IRS Notice 88–75, which assures the Partnership that so long as less than 5% of its partnership interests are traded in one taxable year and the Partnership's interests are not traded on an established securities market, it will not be considered a Publicly Traded Partnership (the "5% Safe Harbor").[5]

### (2) The Partnership's Investors

At the outset, the Partnership issued all of its limited partnership interests to its Assignor Limited Partner. Third parties invested in the Partnership by purchasing BUC$, which the Partnership sold through its Assignor Limited Partner. A BUC is a certificate that represents the assignment by the Assignor Limited Partner to the person or entity purchasing the BUC (a "BUC$holder") of all of the economic and substantially all of the ownership rights (except for record ownership and the right to vote directly on matters submitted to the limited partners for a vote) of one limited partnership interest.

While under the terms of the Partnership Agreement BUC$holders can convert their BUC$ into limited partnership inter-ests and become limited partners, no BUC$holder has yet done so. As a result, the Assignor Limited Partner remains the Partnership's only limited partner.

BUC$ do not trade on an established securities market. Secondary markets for the purchase and sale of BUC$, however, do exist. Over the past five years, an average of 1.9% of the Partnership's outstanding BUC$ have been traded on the secondary markets each year. This average includes what the Partnership characterizes as an atypically high number of transfers in 1998 of 3% of the outstanding BUC$.

### (3) The Transferability of BUC$

Section 13.1 of the Partnership Agreement requires a BUC$holder to obtain the prior written consent of the General Partner in order to sell, assign, transfer or exchange its BUC$. Section 13.1 also provides that the General Partner,

shall consent to such proposed sale, assignment, transfer or exchange unless:

. . .

13.1.2 subject to Section 15.5.8, absent a change in applicable tax law under Section 7704 of the [Internal Revenue] Code, such transfer would fall outside of the safe harbor provisions of Internal Revenue Service Notice 88–75 (or other safe harbors adopted by the Internal Revenue Service that protect against treatment as a publicly traded partnership);

13.1.3 in the opinion of counsel for the Partnership such sale, assignment,

---

2. Under I.R.C. § 7704(b) a partnership is a Publicly Traded Partnership if (1) interests in the partnership are traded on an established securities market, or (2) interests in the partnership are readily tradeable on a secondary market or the substantial equivalent thereof.

3. *See* I.R.C. § 7704(c).

4. I.R.C. § 7704.

5. I.R.S. Notice 88–75 (July 5, 1988). As set forth in footnote 2 *supra*, there are two ways a partnership can qualify as a Publicly Traded Partnership: (1) if its interests are traded on an established securities market, or (2) if its

interests are tradeable on a secondary market or the substantial equivalent thereof. The 5% Safe Harbor provides that if less than 5% of a partnership's interests are sold or otherwise disposed of during the taxable year, the partnership's interests will not be considered tradeable on a secondary market or the substantial equivalent thereof. It follows, therefore, that if a partnership qualifies for the 5% Safe Harbor and its partnership interests are not tradeable on an established securities market, the partnership is not a Publicly Traded Partnership under Section 7704.

transfer or exchange would be in violation of any applicable federal or state securities laws (including any investor suitability standards);

. . .

Any attempted sale, assignment, transfer or exchange in contravention of the provisions of this Article 13 shall be void and ineffectual and shall not bind or be recognized by the Partnership, the General Partner, the Assignor Limited Partner, any transfer agent, the Selling Agent or any other agent of the General Partner or the Partnership.

## C. Bond's Purchase of BUC$ and Demand for a List of the Partnership's Partners and BUC$holders

On October 1, 1997, Bond purchased five BUC$ on a secondary market for BUC$. On November 24, 1997, Bond sent to the Partnership a written demand for the "investor list," which presumably included a list of the BUC$holders and limited partners (the "Investor List"). The written demand stated that Bond was making its request pursuant to Article 14 of the Partnership Agreement. In the demand letter, Bond set forth two reasons for requesting the Investor List: (i) to discuss various partnership matters with the other owners, including concerns regarding the Partnership's management, and (ii) to communicate with any "limited partners" interested in selling their "shares." Bond indicated in the demand letter that it might make an offer to purchase up to 4.9% of the total outstanding "limited partnership interests" from any "limited partners" interested in selling their limited partnership interests. Given the fact that the Assignor Limited Partner

is the Partnership's only limited partner and that the focus in this litigation has been on Bond's right to a list of the BUC$holders, it appears that Bond intended the use in its demand letter of the terms "limited partners" and "limited partnership interests" to include BUC$holders and BUC$, respectively. The Partnership has refused to provide Bond with a copy of the Investor List.

After some correspondence between Bond and the Partnership, Bond seemed to have abandoned its request for the Investor List for the purpose of discussing various partnership matters with the other owners, and has focused on its request for the Investor List for the purpose of commencing an offer to purchase up to 4.9% of the limited partnership interests. The Partnership has refused to provide Bond with a copy of the Investor List for the purpose of commencing its "mini-tender offer," maintaining that Bond's desire to commence the mini-tender offer is an improper purpose for requesting the Investor List.[6] Eventually, Bond filed this action.

## III. The Parties' Contentions

Bond claims that under 6 *Del.C.* § 17–305 ("Section 17–305") it has a statutory right to the Investor List and that under Article 14 of the Partnership Agreement it has a contractual right to the Investor List. The Partnership claims that Bond is not entitled to the Investor List under Section 17–305 because it does not have a proper purpose for requesting the Investor List and because the General Partner in good faith believes that providing Bond with the Investor List would not be in the best interest of the Partnership. The

6. The Partnership also refused to provide Bond with a copy of the Investor List so that Bond could communicate with the other owners concerning the Partnership's management. The Partnership considered its October 1, 1997 change in management to have mooted any concerns Bond might have had about the Partnership's management. The Partnership also instructed Bond that if it had any other purpose for investor communica-

tions with respect to the operation and management of the Partnership, that it should send to the Partnership a copy of the communication that it would like to have distributed to investors. The Partnership then would distribute, at Bond's cost, Bond's communication to the other investors if the Partnership determined that the communication was for a proper purpose, factually accurate, not misleading and not in violation of any law.

Partnership also claims that the Partnership Agreement does not provide Bond with a contractual right to the Investor List. The Partnership further claims that even if Bond has a statutory or contractual right to the Investor List, the Partnership still is entitled to decline Bond's request for a copy of the Investor List pursuant to the "improper purpose defense" set forth in *Schwartzberg v. CRITEF Assocs. Ltd. Partnership.*[7] Finally, the Partnership claims that if this Court finds that Bond has any right to the Investor List, then the Court, pursuant to Section 17–305(e) (with respect to a statutory right) or the Court's equitable powers to shape the appropriate remedy (with respect to a contractual right), should impose specific conditions on Bond's access to and use of the Investor List.

## IV. Analysis

I address below Bond's claims that it has both a statutory and contractual right to the Investor List.

### A. Bond's Statutory Claim

1. The Existence of Bond's Statutory Right

Both Bond and the Partnership agree that the Partnership agreement grants Bond, as a BUC$holder, the same statutory rights to obtain information from the Partnership that limited partners have under Section 17–305. They are correct.

Section 12.2 of the Partnership Agreement provides:

*Assignment by Assignor Limited Partner.* The Assignor Limited Partner, by the execution of this Agreement, irrevocably transfers and assigns to the BUC$holders all of the Assignor Limited Partner's rights and interests in and to the underlying Limited Partnership Interests (the "Assigned Limited Partnership Interests") (except for record ownership and the right to vote directly on matters submitted to Limited Partners for a vote) as of the earlier of the

Closing with respect to the BUC$ purchased or the time of release to the Partnership of payments for the BUC$.

As the Partnership Agreement does not specifically address the Assignor Limited Partner's rights to obtain information from the Partnership, the Assignor Limited Partner's right to obtain information from the Partnership are those set forth in Section 17–305. Pursuant to Section 12.2 of the Partnership Agreement and Bond's and the other BUC$holders' purchase of BUC$, the Assignor Limited Partner assigned to Bond and the other BUC$holders its rights under Section 17–305, including the limitations on those rights, to obtain information from the Partnership.

 While the Partnership does not seem to dispute the issue, I conclude that the Investor List is included in the information to which Bond is entitled under Section 17–305, if, in fact, Bond satisfies Section 17–305's prerequisites to its rights and its rights are not otherwise limited by Section 17–305. Section 17–305 provides,

(a) Each limited partner has the right, subject to such reasonable standards (including standards governing what information and documents are to be furnished, at what time and location and at whose expense) as may be set forth in the partnership agreement or otherwise established by the general partners, to obtain from the general partners from time to time upon reasonable demand for any purpose reasonably related to the limited partner's interest as a limited partner:

. . .

(3) A current list of the name and last known business, residence or mailing address of each partner;

. . .

(6) Other information regarding the affairs of the limited partnership as is

**7.** Del. Ch., 685 A.2d 365, 375–77 (1996).

just and reasonable.[8]

■ Both Section 17–305(a)(3) and (a)(6) encompass the Investor List. Although Section 17–305(a)(3) is specific to "partners," in assigning this right to BUC$holders, I conclude that parties to the Partnership Agreement intended to expand this right to include a list of the BUC$holders as well as a list of the Partnership's partners. By the Partnership's own admission, the rights the Assignor Limited Partner granted the BUC$holders, including the Assignor Limited Partner's rights under Section 17–305, "were intended to track those of limited partners under Delaware law."[9] Section 17–305(a)(3) grants limited partners the right to a list of the names and addresses of all the other partners in the partnership. Where, as here, a partnership is structured for tax or other legal considerations so that almost all of its investors are not the owners of limited partnership units, and, therefore, not limited partners but rather the owners of an investment unit that at a minimum has essentially the same rights and obligations as a limited partnership unit, it only makes sense for the alternative investment units' owners' rights under Section 17–305(a)(3) to include the right to a list of the names and addresses of the other owners of the same investment unit. Otherwise, their rights under Section 17–305(a)(3) would be meaningless and Section 17–305(a)(3)'s purpose would not be fulfilled.

■ In any event, the BUC$holders' rights under Section 17–305(a)(6) also encompass a current list of the name and last known business, residence or mailing address of each BUC$holders. In this instance where all of the partnership's investors, with the exception of the General Partner and the Assignor Limited Partner, are BUC$holders, a list of the names and addresses of the BUC$holders certainly constitutes "[o]ther information regarding the affairs of the limited partnership as is just and reasonable."[10]

## 2. Is Bond Entitled to the Investor List Under 6 Del.C. Section 17–305?

As applied to Bond, Section 17–305(a) requires that Bond have a purpose for requesting the Investor List that is reasonably related to its interest as a BUC$holder.[11] In the event that Bond establishes a proper purpose for requesting the Investor List, Section 17–305(b) permits the General Partner to refuse to furnish the Investor List if the General Partner can prove that it believes in good faith that disclosure is not in the best interest of the limited partnership or that disclosure could damage the limited partnership or its business.[12] · The statutory claim, therefore, implicates three issues: (i) what is Bond's purpose, (ii) is that purpose sufficient under Section 17–305(a); and (iii) if Bond's purpose is "proper," does the General Partner in good faith believe

---

**8.** 6 *Del.C.* § 17–305.

**9.** The Partnership made this admission as part of an argument that the only rights the Partnership Agreement granted the BUC$holders were those the Assignor Limited Partner assigned to them. While I ultimately disagree with the Partnership's argument that the Partnership Agreement grants the BUC$holders only those rights that the Assignor Limited Partner assigned to them, I do not consider that disagreement to undermine in any way the Partnership's statement that the rights assigned to the BUC$holders by the Assignor Limited Partner, as opposed to the rights Section 14.1 grants the BUC$holders, were intended to track those of limited partners under Delaware law.

**10.** 6 *Del.C.* § 17–305(a)(6).

**11.** *See* 6 *Del.C.* § 17–305(a) (stating that a limited partner's purpose for requesting partnership information must be "reasonably related to the limited partner's interest as a limited partner....").

**12.** *See* 6 *Del.C.* § 17–305(b) (stating that "[a] general partner shall have the right to keep confidential from limited partners for such period of time as the general partner deems reasonable, ... information the disclosure of which the general partner in good faith believes is not in the best interest of the limited partnership or its business ....").

that disclosure of the Investor List is not in the best interest of the Partnership or could damage the Partnership or its business?

### (a) Bond's Purpose

 I conclude that Bond's purpose in requesting the Investor List is to enable Bond to communicate to other BUC$holders Bond's offer to purchase up to 4.9% of the outstanding limited partnership interests in the Partnership. Although Bond included additional purposes for requesting the Investor List in its initial communications with the Partnership, Bond did include the possibility of this mini-tender offer in its first communication to the Partnership in which it requested the Investor List. Bond's later communications with the Partnership, furthermore, focused on Bond's intent to use the Investor List to conduct a mini-tender offer, and Bond eventually provided the Partnership with a copy of the offer it intended to send to the Partnership's investors. While the Partnership "questions" whether Bond is secretly seeking the Investor List in order to induce Bond's affiliate Maxus Properties, Inc. into a property management role with respect to some of the properties in which the Partnership has invested, the Partnership sets forth no evidence that Bond is seeking the list for this purpose. Finally, while at trial Bond's chief executive officer expressed his view on cross-examination that Bond could use the Investor List for any purpose, I consider his testimony to have been more in support of his position that Bond has a right to the investor list as opposed to an expression of his intention to use the list for a purpose other than commencing Bond's mini-tender offer. Bond's history of conducting similar tender offers bolsters my conclusion that Bond is requesting the Investor List to commence a mini-tender offer.

### (b) The Legal Sufficiency of Bond's Purpose

Bond's desire to obtain the Investor List so that it can communicate its mini-tender offer to the other BUC$holders is reasonably related to its interest as a BUC$holder and, therefore, is legally sufficient under Section 17–305. In determining whether a specific purpose is a "proper purpose" under Section 17–305, this Court in the past has referred to whether that purpose has been deemed a "proper purpose" under 8 Del.C. § 220, which is the corporate analogue to Section 17–305.[13] The desire to obtain a shareholder list in order to facilitate communications in connection with a tender offer is a proper purpose under 8 Del.C. § 220.[14] The Partnership has suggested no reason why that purpose is improper in the partnership context. Also, I do not consider Bond's purpose to be made improper because it might have purchased its BUC$ as a prelude to a demand for the Investor List.[15]

In addition, in In re Paine Webber Limited Partnerships ("PaineWebber I") and In re Paine Webber Qualified Plan Property Fund Three, L.P. Litig. ("PaineWebber II"), this Court suggested that a limited partner's desire to obtain a list of limited partners to commence a tender offer is a proper purpose under Section 17–305.[16] In PaineWebber I and PaineWebber II, this Court found that the limited partners' purpose was not proper when they were requesting lists of limited partners so that they could make the list avail-

---

13. See, e.g., In re Paine Webber Limited Partnerships, Del. Ch., C.A. No. 15043, slip op. at 7, Jacobs, V.C., 1996 WL 535403 (Sept. 17, 1996).

14. Vista Resources v. Camelot Indus. Corp., Del. Ch., C.A. No. 6744, Brown, V.C., 1982 WL 17850 (Mar. 30, 1982); Mite Corp. v. Heli–Coil Corp., Del. Ch., 256 A.2d 855, 856 (1969).

15. See Mite Corp., 256 A.2d at 856.

16. In re Paine Webber Limited Partnerships, Del. Ch., C.A. No. 15043, slip op. at 8–9, Jacobs, V.C., 1996 WL 535403 (Sept. 17, 1996); In re Paine Webber Qualified Plan Property Fund Three, L.P. Litig., Del. Ch., 698 A.2d 389, 391 (1997).

able to non-limited partner investment funds that would commence a tender offer in which the requesting limited partners' participation would be minimal.[17] In finding the limited partners' purpose improper, this Court in *PaineWebber I* and *PaineWebber II* emphasized that the requesting limited partners' participation in the tender offers would be minimal or limited, and, based on that finding, concluded that the use of the list to aid in the tender offers at issue was a purpose that related solely to the investment funds' interest as potential buyers, not to the requesting limited partners' interest as limited partners.[18] This Court's emphasis in *PaineWebber I* and *PaineWebber II* on the requesting limited partners' minimal participation in the tender offers suggests that the Court would have found the requesting limited partners' purpose proper if the requesting limited partners' themselves were going to conduct the tender offers or if the requesting limited partners' participation in the tender offers were going to be more than *de minimis*. Unlike the requesting limited partners in *PaineWebber I* and *PaineWebber II*, Bond itself will be conducting the tender offer at issue.

Consistent with the law in the corporate context and this Court's reasoning in *PaineWebber I* and *PaineWebber II*, I conclude that Bond's purpose for requesting the Investor List is related to Bond's interest as a BUC$holder, and, therefore, that Bond's purpose is a proper purpose under Section 17–305(a).

**(c) Can the General Partner Deny Bond Access to the Investor List under Section 17–305(b)?**

■ Under Section 17–305(b) the General Partner can deny Bond access to the Investor List. I am convinced that the General Partner in good faith believes that production of the Investor List is not in the best interest of the Partnership and could damage the Partnership. The Gen-

eral Partner's chief executive officer testified at trial that he believed that Bond's mini-tender offer for 4.9% of the outstanding limited partner interests would cause the Partnership to fall outside of the 5% Safe Harbor and, as a result, to be considered a Publicly Traded Partnership. Bond admits that this effect would cause the Partnership and its investors significant damage as the Partnership no longer would be able to pass its tax credits and losses onto its investors. While it is unclear because of the complex and underdeveloped nature of the relevant federal tax law whether Bond's mini-tender offer in fact would have this effect, I am convinced that the General Partner in good faith believes that there is a significant risk of the mini-tender offer having this effect. The General Partner's chief executive officer was a credible witness and there is nothing in the record that convinces me that he is acting other than to protect the Partnership and its investors from the risk of the Partnership being classified as a Publicly Traded Partnership and the associated adverse consequences.

Because the General Partner believes in good faith that providing the Investor List to Bond is not in the best interest of the Partnership and could damage the Partnership, the General Partner is entitled under Section 17–305(b) to deny Bond its statutory right to access the Investor List for its otherwise proper purpose. Bond, therefore, is not entitled by statute to a copy of the Investor List.

**B. Bond's Contractual Right**

**1. The Existence of Bond's Contractual Right to the Investor List**

Bond argues that in addition to the statutory rights the Partnership Agreement assigns to the BUC$holders, the Partnership Agreement also provides the BUC$holders with a contractual right to the Investor List. Bond maintains that the

**17.** *Id.*

**18.** *Id.*

Partnership Agreement sets forth this right in Section 14.1, which provides:

> *Location of Records.* The *Partnership's books and records,* this Agreement and any amendment hereto or restatement hereof, any separate certificate of limited partnership and any amendment thereto or restatement thereof, copies of each Appraisal of a Property and copies of the financial statements of each Local Partnership provided to the Special Limited Partner shall be maintained at the principal offices of the Partnership or such other place as the General Partner may determine and *shall be open to inspection, examination and copying by BUC\$holders or their duly authorized representatives at all times* .... The BUC\$holders shall not receive copies of this Agreement and any amendment hereto or restatement hereof, the Certificate or any amendment thereto or restatement thereof or *a current list of all Partners in the Partnership* unless they request in writing a copy from the General Partner and pay any necessary duplication fee. (emphasis added).

The Partnership, however, argues that the BUC\$holders' only right to partnership information are their rights under Section 17–305, which the Assignor Limited Partner assigned to them, and that Section 14.1 merely clarifies the BUC\$holders rights under Section 17–305 (by stating where and when the Partnership's books and records will be available for inspection and copying) and places additional conditions on those rights (by stating that a BUC\$holder shall not receive a list of the Partnership's limited partners unless a BUC\$holder makes its request in writing and pays any necessary duplication fee). The Partnership claims that any other interpretation of the Partnership Agreement would be inconsistent with Sections 12.2 and 22.8 of the Partnership Agreement. The Partnership also seems to ar-

gue that in the event that this Court finds that Section 14.1 grants the BUC\$holders contractual rights in addition to those rights the Assignor Limited Partner assigned to them, those contractual rights do not include a right to obtain the Investor List. The Partnership argues that Delaware law is clear that a general books and records clause like the first sentence in Section 14.1 does not create a contractual right to a list of limited partners or BUC\$holders. Citing *Schwartzberg v. CRITEF Assocs., L.P.,*[19] *PaineWebber I*[20] and *PaineWebber II,*[21] the Partnership maintains that only a specific, express provision stating that a limited partner or BUC\$holder is entitled to a *list of the Partnership's limited partners or BUC\$holders* can create a contractual right to those lists.

Resolution of the parties' dispute requires me first to determine whether Section 14.1 grants BUC\$holders contractual rights in addition to those rights that the Assignor Limited Partner assigned to them or whether Section 14.1 merely clarifies and places further conditions on the rights the Assignor Limited Partner assigned to the BUC\$holders. If I conclude that Section 14.1 grants BUC\$holders additional contractual rights, I then must determine whether those rights include a right to obtain the Investor List.

**(a) Does Section 14.1 Grant BUC\$holders Independent Contractual Rights?**

■ I conclude that Section 14.1 grants BUC\$holders the contractual right to inspect, examine and copy at all times the Partnership's books and records. I also conclude that this contractual right is in addition to and separate from the right to obtain information from the Partnership pursuant to Section 17–305 that the Assignor Limited Partner assigned to BUC\$holders. First, Section 14.1 on its face grants BUC\$holders the right *at all*

---

19. Del. Ch., 685 A.2d 365 (1996).

20. Del. Ch., C.A. No. 15043.

21. Del. Ch., 698 A.2d 389.

*times* to inspect, examine and copy the Partnership's "books and records." Second, this provision in Section 14.1 is specific to BUC$holders, indicating an intention to create a right in addition to the rights the Assignor Limited Partner assigned to the BUC$holders. Third, Section 14.1 makes no mention either of the rights the Assignor Limited Partner assigned to the BUC$holders or of an intention to clarify or place further conditions on those rights. I cannot conclude, therefore, that Section 14.1 had that purpose when on its face it appears to grant an independent, additional right to the BUC$holders. Fourth, there is nothing in the Partnership Agreement that convinces me that the BUC$holders' only rights were to be those rights the Assignor Limited Partner assigned to them. Section 12.5 provides that in accordance with the Assignor Limited Partner's assignment of its rights and interests in its limited partnership units to BUC$holders, the "BUC$holders shall have the same rights and powers assigned to them by the Assignor Limited Partner under this Agreement and shall be subject to the same liabilities that Limited Partners have under this Agreement and the Partnership Act." Neither Section 12.5 nor any other section of the Partnership Agreement, however, provides that the rights and liabilities that the Assignor Limited Partner assigned to the BUC$holders were the *only* rights the BUC$holders were to have under the Partnership Agreement.

I recognize that Section 14.1's caption "Location of Records" supports the Partnership's position that Section 14.1 is merely an administrative provision providing the means by which BUC$holders are to exercise their statutory right to obtain partnership information that the Assignor Limited Partner assigned to them. Section 22.5 of the Partnership Agreement entitled "Headings," however, provides that "[s]ection and [p]aragraph titles and captions contained in this Agreement are inserted only as a matter of convenience and reference and in no way define, limit, extend or describe the scope of this Agreement nor the intent of any provision hereof." In light of Section 22.5 and my findings set forth in the preceding paragraph, it would be inappropriate for me to base an interpretation of Section 14.1 entirely on Section 14.1's caption. In any event, I consider my findings in the preceding paragraph to outweigh the implication of Section 14.1's caption that the section is merely administrative in nature.

I note that my interpretation of the first sentence of Section 14.1 is consistent with this Court's interpretation of the partnership agreement in *Schwartzberg v. CRITEF Assoc. Ltd. Partnership.*[22] Although it does not appear the defendant partnership in *Schwartzberg* argued that the relevant provision in the partnership agreement did not create a separate and independent contractual right among the plaintiff partners, it is implicit in this Court's decision in *Schwartzberg* that this Court considered a similar provision in a partnership agreement to create a contractual right to inspect and copy the partnership's records.[23] The provision in *Schwartzberg* entitled "Books and Records" provided, "[t]he Partnership shall keep at its Office the following records, which are subject to inspection and copying at the reasonable request, and at the expense, of any Partner during ordinary business hours ...."[24] I recognize that the provision in the *Schwartzberg* partnership agreement went on to list specific records, including a list of partners, as opposed merely to referring to "books and records" like the first sentence in Section 14.1. The absence of a list in Section 14.1 stating what records the term "books and records" encompasses, however, is not relevant to whether the provision creates a

---

**22.** Del. Ch., 685 A.2d 365 (1996).

**23.** *See id.* at 375–76.

**24.** *Id.* at 375.

separate and independent contractual right to inspect, examine and copy the Partnership's "books and records" at all times. The portion of the provision in the *Schwartzberg* partnership agreement that I have quoted, rather, is the portion that creates the contractual right to the records which the provision goes on to list. That portion of the provision is similar to the first sentence in Section 14.1 since it states where the enumerated records are to be maintained, that they are subject to inspection by the partners and when the partners can inspect them. Of even greater significance, the provision in *Schwartzberg*, like Section 14.1, does not expressly state that the provision is creating a contractual right to the enumerated records that is separate and distinct from the partners' statutory right to inspect and copy the records. Despite the absence of an express statement, the Court considered the provision to create a contractual right to a list of partners, which was one of the "records" that the provision listed.

■ Contrary to the Partnership's contention, it is not necessary for Section 14.1 or similar partnership provisions to include explicit language that they are creating contractual rights separate and independent of statutory rights in order for those provisions to in fact create a separate and independent contractual right. Rather, where a provision in a partnership agreement appears on its face to create a right separate and independent from a statutory right or a right granted in another section of the partnership agreement, the partnership agreement must explicitly state that the provision is merely clarifying or placing additional conditions on the other statutory or contractual right if in fact that is the provision's intended purpose. Otherwise, this Court will conclude that the parties intended the provision to create the

separate and independent contractual right that the provision on its face purports to create.

**(b) Does Bond's Contractual Right Include the Right to Obtain the Investor List?**

■ Having concluded that Section 14.1 grants the BUC$holders a contractual right to inspect, examine and copy the Partnership's "books and records" at all times, I must determine whether the term "books and records" encompasses the Investor List. One canon of contract construction guides my decision on this issue:

> If parties introduce conflicting interpretations of a term, but one interpretation better comports with the remaining contents of the document or gives effect to all the words in dispute, the court may, as a matter of law and without resorting to extrinsic evidence, resolve the meaning of the disputed term in favor of the superior interpretation.[25]

Here, I conclude the superior interpretation of the term "books and records" is one that encompasses a list of the Partnership's partners and BUC$holders because that interpretation better comports with the remaining provisions in Section 14.1.

After granting BUC$holders the right to inspect, examine, and copy at all times the Partnership's books and records, Section 14.1 goes on in the second sentence in the above quote of Section 14.1[26] to set forth special requirements for a BUC$holder to obtain a list of the partners in the Partnership. Under an interpretation of the term "books and records" that encompasses a list of partners, this provision can be read as modifying the broad contractual right to inspect, examine and copy at all times the Partnership's books and records that the first sentence in Section 14.1 creates. This interpretation renders Section 14.1 a logically drafted section which creates a broad

---

**25.** *Wills v. Morris, James, Hitchens & Williams,* Del. Ch., C.A. No. 15297, ltr. op. at 4, Chandler, C., 1998 WL 842325 (Nov. 6, 1998).

**26.** *See supra* p. 853.

right and then goes on to carve out exceptions to that right or place limitations on that right. Under an interpretation of the term "books and records" that does not encompass a list of partners, however, I would have to conclude that the second sentence in the above quote of Section 14.1 modifies the BUC$holders statutory right to a list of the partners that the Assignor Limited Partner assigned to the BUC$holders pursuant to Section 12.2 of the Partnership Agreement.[27] I would have to reach this conclusion despite the fact that the provision is in the same section of the Partnership Agreement that grants BUC$holders a contractual right to inspect, examine and copy the Partnership's books and records, as opposed to the section that creates the statutory right it would be modifying, and despite the fact that this provision does not even mention the statutory right it supposedly would be modifying. Clearly the interpretation of "books and records" that includes a list of partners better comports with the second sentence in the above quote of Section 14.1, and, as a result, I accept that interpretation.

Because I conclude that the term "books and records" as used in Section 14.1 includes a list of the Partnership's partners, I also conclude, on the basis of the same canon of contract construction, that the term "books and records" as used in Section 14.1 includes a list of BUC$holders.[28] To conclude otherwise would be illogical. It would make no sense for the first sentence, through the use of the term "books and records," to grant BUC$holders a right to a list of Partners (although qualified by the second sentence quoted above), who are not identically situated to the BUC$holders, but not to grant BUC$holders a right to a list of BUC$holders, who

are identically situated to each other. Since neither Section 14.1 nor any other provision in the Partnership Agreement restricts or limits the BUC$holders contractual right, as set forth in the first sentence of Section 14.1, to access the Partnership's list of BUC$holders, BUC$holders have the contractual right to inspect, examine and copy a list of the BUC$holders at all times, regardless of their purpose for inspecting, examining or copying the list. Bond, furthermore, has a contractual right to a copy of a current list of all Partners in the Partnership so long as it requests in writing a copy from the General Partner, which it has done, and pays any necessary duplication fee, which presumably it would be willing to do.

The cases the Partnership cites do not support the proposition that only a specific, express provision stating that a limited partner is entitled to a list of the limited partners can create a contractual right to that list. While the partnership agreements at issue in *Schwartzberg, PaineWebber I* and *PaineWebber II* all contained specific, express provisions providing the plaintiff limited partners a right to access a list of limited partners, the Court in none of those cases even suggested that those specific, express provisions, as opposed to a general books and records provision alone, were necessary to create a contractual right to a list of limited partners. Since the specific, express provisions existed, the Court of course focused on them in its analysis and there was no need to reach the issue of whether the general books and records provisions, which also existed in the partnership agreements at issue in those cases, could create a contractual right to access a limited partner list.[29]

27. I note that I interpret the second sentence in the above quote of Section 14.1 to modify a right to a list of the Partnership's partners and not to create that right.

28. My conclusion should not be taken for the proposition that the term "books and records" always includes a list of a partnership's partners or other investors.

29. In *PaineWebber II,* this Court did reject the defendants' attempt to apply the proper purpose requirement found in the general books and records provisions of two of the partnership agreements at issue to the plaintiffs' con-

■ I do not consider my interpretation of Section 14.1 to be inconsistent with Section 22.8 of the Partnership Agreement. Section 22.8 provides that "the Partnership Act [i.e. the DRULPA] as now adopted and as hereafter amended from time to time shall govern the partnership aspects of this [Partnership] Agreement." The Partnership argues that Section 22.8 "makes explicitly clear that the parties intended [the] DRULPA to govern such 'partnership aspects' as obtaining information from the Partnership." I agree that Section 22.8 makes explicitly clear that the parties intended the DRULPA to govern a BUC$holder's request to obtain partnership information pursuant to its right under Section 17–305, which the Assignor Limited Partner assigned to it. Since the BUC$holder would be making that request essentially in the shoes of a limited partner, that request would constitute a "partnership aspect" of the Partnership Agreement. I cannot agree, however, that Section 22.8 makes clear that the provisions of the DRULPA would govern a BUC$holder's request, pursuant to its contractual right not shared with the limited partners, for partnership information. Since a BUC$holder's right pursuant to Section 14.1 is not one shared with the limited partners, I do not consider a BUC$holder's exercise of that right to be a "partnership aspect" of the Partnership Agreement.

## 2. The Implied Improper Purpose Defense

■ The Partnership argues that under the "improper purpose defense" articulated by Chancellor Allen in *Schwartzberg,* I should deny Bond access to the Investor List. Under the "improper purpose defense," this court is warranted in denying a partner's request for access to a partnership's records when (i) neither an explicit contractual provision in a partnership agreement nor statutory language negate the notion that a partner must have a proper purpose and (ii) the partner denying another partner access to partnership business records can show that the partner seeking access is doing so for a purpose personal to that partner and adverse to the interests of the partnership considered jointly.[30]

Chancellor Allen articulated the "improper purpose defense" by applying general contract principles regarding a court's ability to infer implicit obligations into a contract to the context of a general partner's statutory and contractual rights to access a partnership's list of partners.[31] Chancellor Allen pointed out that under Delaware law, an obligation may be inferred from a contract when, given the terms of the express contract made and the circumstances of the contracting process, it is more likely than not that if the parties had thought to address the subject,

tractual right to a list of the partners. The Court's reason for doing this, however, was that the two partnership agreements also had separate, specific, express provisions addressing the limited partners' right to access a list of limited partners which did not have the proper purpose requirement that the more general books and records provision contained. I note that the Court treated these two partnership agreements differently than the other four partnership agreements at issue in the case because, unlike the other four partnership agreements, the provisions in these two partnership agreements creating the limited partners' contractual right to a list of limited partners required a limited partner requesting a list of limited partners to make a representation "to the effect that such Partner shall not use such list for any purpose other

than one related to the operation of the partnership." As a result, while the Court held that the other four partnerships had to provide the plaintiffs with the lists of limited partners for the partnerships that did not contain this extra clause, the Court held that the two defendant partnerships with this extra clause could condition plaintiffs' right to the lists upon receipt of a representation that plaintiffs would not use the lists to solicit partners except for matters relating to the business or operation of the partnership. *See PaineWebber II,* 698 A.2d at 392–93.

30. 685 A.2d at 377.

31. *Id.* at 375–77.

they would have agreed to create the obligation that is under consideration by the court *ex post facto.*[32] In applying this law to a partnership provision granting rights to partners to access the partnership's list of partners, Chancellor Allen concluded that in the absence of an explicit contractual provision or statutory language negating the requirement of a proper purpose, it is more likely than not that if the parties to a partnership agreement had thought to address the subject, they would have agreed that a partner should be denied access to a list of partners when the partner would use the list for a purpose personal to that partner and adverse to the interests of the partnership when considered jointly.[33]

In *PaineWebber I,* Vice Chancellor Jacobs limited the application of the "improper purpose defense" to partnerships formed after September 1, 1985.[34] Vice Chancellor Jacobs noted that before September 1, 1985, Delaware law required limited partnerships to include a list of limited partners in their publicly-filed certificate of limited partnership, and thus as a matter of public record.[35] On September 1, 1985 the law changed so that Delaware limited partnerships were no longer required to file publicly a list of their limited partners.[36] Because limited partnerships formed before September 1, 1985 were required to file publicly a list of their limited partners, Vice Chancellor Jacobs reasoned that this Court cannot conclude for those partnerships that if the persons who negotiated the partnership agreements had addressed the subject of access to a list of partners, they "more likely than not" would have agreed to deny access to the lists that were already a matter of public record.[37]

In this instance, neither Section 17–305 (the relevant statute) nor Section 14.1 (the relevant contract provision) negates the notion of the "improper purpose defense." In fact, Section 17–305 contains a proper purpose requirement. Furthermore, the Partnership was formed in 1989, well after the September 1, 1985 amendment to the limited partnership law. Finally, while the "improper purpose defense" to date has only been applied to a partner's contractual right to a list of partners, its follows from its contract law origins and the similarities between BUC$holders in this case and the general or limited partners in the cases in which this Court has applied it, that the "improper purpose defense" also applies to Bond's contractual right to a list of BUC$holders. I must determine, therefore, whether the Partnership has proved that Bond's purpose for requesting the Investor List is personal to Bond and adverse to the interests of the Partnership considered jointly.

### (a) Bond's Purpose is Personal to Bond

Bond admits that its purpose for requesting the Investor List is to commence a mini-tender offer for up to 4.9% of the outstanding BUC$. The Partnership claims that this purpose is personal to Bond because Bond's goal is to buy BUC$ as cheaply as possible and because Bond is not seeking the Investor List for some change that arguably might be beneficial to the other investors. The Partnership's allegation is supported by the fact that the price at which Bond informed the Partnership it would make its offer was, at the time Bond passed this information onto the Partnership, below the price for which BUC$holders could sell their BUC$ on an

---

32. *Id.* (citing *Katz v. Oak Indus., Inc.,* Del. Ch., 508 A.2d 873 (1986)).

33. *Id.* at 376–77.

34. Del. Ch., C.A. No. 15043 at 13–14.

35. *Id.*

36. *Id.* (citing 65 Del. Laws 188 (1985), amending and restating 63 Del. Laws 420 (1983)).

37. *Id.*

existing secondary market.[38] Bond offers no theory or explanation to counter the Partnership's argument that Bond's mini-tender offer would neither benefit the Partnership nor the other BUC$holders. As a result, I conclude that Bond's purpose for requesting the Investor List is personal to Bond.

### (b) The Partnership Fails to Meet Its Burden of Proving that Bond's Purpose Is Adverse to The Interests of the Partnership As a Whole

 While the Partnership proved by a preponderance of the evidence that the General Partner in good faith believes that disclosing the Investor List to Bond is not in the best interest of the Partnership, it failed to prove by a preponderance of the evidence that disclosing the Investor List to Bond would in fact be adverse to the interests of the Partnership. In order to establish the improper purpose defense for the purpose of denying a partner its contractual right to a list of partners, a partnership must prove that disclosure of a list of partners, or in this case partners and BUC$holders, would in fact be adverse to the Partnership.[39] That is, the partnership must prove that the adverse effect it believes disclosure of the list would have on the partnership is more likely than not to occur if the partnership discloses the list to the partner.[40] Under 17–305(b), on the other hand, the general partner of a partnership needs to prove by a preponderance of the evidence only that there is a basis for it in good faith to

believe that providing a partner with a list of partners would not be in the best interest of the partnership or would damage the partnership.[41] The partnership does not need to prove that it is more likely than not that actual damage would occur if the partnership were to disclose the list. The distinction in proof between Section 17–305(b)'s defense to a statutory claim and the "improper purpose defense" to a claim of contractual right is appropriate because in the case of a contractual right parties to the partnership may bargain for language in the partnership agreement designed to give partners access to information under terms less restrictive and in addition to that granted by statute.[42] While consideration must be given to the managing general partner's overarching general fiduciary duties to all other partners and to the partnership as a whole, the correct balance between a limited partner's right of access under the agreed terms of the partnership agreement and the discharge of the managing general partner's fiduciary duties can be reached by examination of the *actual* basis for the alleged harm that would be caused to the partnership as a whole by granting that one partner the access requested pursuant to the partnership agreement.

The Partnership argues that Bond's purpose for requesting the Investor List is adverse to the interests of the Partnership for four reasons, but for the following reasons failed to meet its burden of proof as discussed in the preceding paragraph.

---

38. Bond's proposed mini-tender offer sought to purchase BUC$ for $231 per unit. At the time of that proposal, it appears that the secondary market prices for BUC$ were averaging close to or more than $400.

39. *See supra* p. 857.

40. *See PaineWebber I*, C.A. No. 15043 at 15 (stating, "*Schwartzberg* holds that in cases when [the improper purpose] defense can be implied, inspection relief may be denied if the partnership can demonstrate that the plaintiff partner's purpose ... (b) *would actually harm*

the value of the joint investment.") (emphasis added).

41. *See supra* pp. 850, 852.

42. *Cf. PaineWebber I*, C.A. No. 15043 at 15 (stating "*Schwartzberg* did not (as defendants argue) blanketly infer a statutory "proper purpose" requirement into all partnership agreements, for to do that would effectively override all partnership agreements that expand inspection rights conferred by statute by not requiring a showing of proper purpose.")

### (i) The Partnership's Claim that Bond's Mini–Tender Offer Would Cause the Partnership to Fall Outside of the 5% Safe Harbor

First, the Partnership argues that Bond's proposed purpose presents serious risks to the Partnership's tax status. Because on average 1.9% of the BUC$ are traded each year, the Partnership claims that Bond's tender offer for 4.9% of the outstanding BUC$ could place it outside of the 5% Safe Harbor and presumably place the Partnership at risk of being classified as a Publicly Traded Partnership. Bond, however, argues that the Partnership would not fall outside of the 5% Safe Harbor because (i) pursuant to the relevant tax laws and regulations, the transfers pursuant to Bond's tender offer could be disregarded for the purposes of the 5% Safe Harbor; (ii) Bond nonetheless has agreed to limit the amount of BUC$ which it presents to the Partnership for transfer in the calendar year it makes its tender offer to an amount that, when combined with prior transfers that year, will not cause the Partnership to exceed the 5% Safe Harbor and then to present the Partnership with the remainder of the transfers the following year; and (iii) pursuant to the Partnership Agreement and the applicable tax laws and regulations, the Partnership could protect itself from falling outside the 5% Safe Harbor by refusing to recognize transfers that would place the Partnership outside the 5% Safe Harbor.

While the General Partner has convinced me that it in good faith believes that the mini-tender could place the Partnership at risk of falling outside the 5% Safe Harbor, the Partnership has failed to convince me, consistent with its burden of proof, that it is more likely than not that the Bond tender offer actually would cause the Partnership to fall outside of the 5% Safe Harbor and that the Partnership would not be able to protect itself from falling outside the 5% Safe Harbor. First, although the Partnership provided an expert opinion that Bond's proposed tender offer does not comply with federal securities law, the Partnership failed to provide an expert opinion that the Bond tender offer would cause the Partnership to fall outside the 5% Safe Harbor.[43] Second, the Partnership fails to discuss the specific language of the 5% Safe Harbor (which contains clauses providing that certain transfers will not be regarded when calculating the percentage of partnership interests that were transferred in any one year) which would show that the Bond tender offer in fact would cause the Partnership to fall outside of the 5% Safe Harbor.[44] Rather, in support of its argument, the Partnership merely (i) cites concessions made by Bond in its post-trial brief and by Bond's chief executive officer in his trial testimony that (a) being classified as a Publicly Traded Partnership would not be in the best interest of the Partnership and the BUC$holders, (b) it is very important that the Partnership maintain its current tax status, and (c) it is standard in the industry for a general partner to prohibit the transfer of more than 5% of the outstanding partnership interests in the partnership in a given year; (ii) states that the Partnership has averaged 1.9% of its units

---

43. Bond suggests that I should infer from the Partnership's failure to call its scheduled tax witness at trial that the tax expert's testimony would have been adverse to their position that Bond's mini-tender offer would cause the Partnership to fall outside the 5% Safe Harbor. Simply by mentioning the fact that the Partnership failed to call an expert tax witness, I am not drawing that inference. Rather, I am simply pointing out the absence of evidence on an element for which the Partnership had the burden of proof. The inference Bond requests me to draw is not necessary for Bond's argument on this issue. I, therefore, do not address the issue of whether it would be appropriate for me to make that inference.

44. The 5% Safe Harbor provides, "[a] transfer will be disregarded for purposes of the [5%] Safe Harbor if such transfer is disregarded for purposes of sections 469(k)(2), 512(c)(2), and 7704(b) of the Code pursuant to section II.B. above." I.R.S. Notice 88–75 (July 5, 1998).

being transferred each year (without explaining whether those transfers would be included in the calculation of the percentage partnership interests transferred in any given year for the purposes of the 5% Safe Harbor);[45] and (iii) argues that Bond's 4.9% mini-tender offer, when combined with the Partnership's annual transfer of 1.9% of its partnership interests, would jeopardize the Partnership's reliance on the 5% Safe Harbor and its tax status.

Of particular concern to me is that the Partnership fails to respond to Bond's point that the Partnership could protect itself from falling outside the 5% Safe Harbor by refusing to recognize, pursuant to Section 13.1.2 of the Partnership Agreement, any transfers in excess of 5% of the total outstanding partnership interests in any one year. While a general partner's failure to recognize a transfer is not one of the transfers that IRS Notice 88–75 expressly states will not be included in the calculation of the 5% Safe Harbor, the regulations that followed Notice 88–75 suggest that the IRS may take that position.[46] As pointed out in footnote 2 *supra*, one way in which a partnership can qualify as a Publicly Traded Partnership is if its interests are readily tradeable on a secondary market or the substantial equivalent thereof. The applicable regulations

state that transfers not recognized by a partnership will not be included in determining whether that partnership's interests are readily tradeable on a secondary market or the substantial equivalent thereof.[47] Without any response from the Partnership or an expert opinion contradicting Bond's position, I cannot ignore this argument, which at least appears consistent with the IRS's position in the regulations it adopted after issuing Notice 88–75.

The Partnership also fails to respond adequately to Bond's proposal that it limit the amount of BUC$ which it presents to the Partnership for transfer in the calendar year it makes its tender offer to an amount that, when combined with prior transfers that year, will not cause the Partnership to exceed the 5% Safe Harbor and then to present the Partnership with the remainder of the transfers the following year. The Partnership's only response is to cite cases involving applications for refunds of income taxes, as opposed to the determination of whether a partnership falls within the 5% Safe Harbor set forth in Notice 88–75, which the Partnership argues indicate that the IRS could take the position that the transfers to Bond over the two year period would count as transfers occurring in one year.[48] The Partnership's citation of these cases alone, however, is not enough to convince me that

**45.** *See id.*

**46.** *See* Treas. Reg. § 1.7704(d) (1995). I note that these regulations appear to permit the Partnership to continue to rely on the 5% Safe Harbor. *See* Treas. Reg. § 1.7704(*l*) (1995).

**47.** *See* Treas. Reg. § 1.7704–1(d) (1995) (stating, "[f]or purposes of section 7704(b) and this section, interests in a partnership are not traded on an established securities market within the meaning of paragraph (b)(5) of this section and are not readily tradeable on a secondary market or the substantial equivalent thereof within the meaning of paragraph (c) of this section (even if interests in the partnership are traded or readily tradable in a manner described in paragraph (b)(5) or (c) of this section) unless—(1) The partnership participates in the establishment of the market or the inclusion of interests thereon, or (2)

The partnership recognizes any transfers made on the market by—(i) Redeeming the transferor partner (in the case of a redemption or repurchase by the partnership); or (2) Admitting the transferee as a partner or otherwise recognizing any rights of the transferee, such as a right of the transferee to receive partnership distributions (directly or indirectly) or to acquire an interest in the capital or profits of the partnership.")

**48.** The Partnership cites the following cases: *Bradford v. United States*, 195 Ct.Cl. 500, 444 F.2d 1133 (1971); *Herbert J. Inv. Corp. v. United States*, 360 F.Supp. 825 (E.D.Wis. 1973), *aff'd*, 500 F.2d 44 (7th Cir.1974); *Fletcher v. United States*, 303 F.Supp. 583 (N.D. Ind.1967); *aff'd*, 436 F.2d 413 (7th Cir. 1971).

it is more likely than not that the IRS would take the position that the Partnership predicts it could take. Furthermore, even if the Partnership's prediction regarding the IRS's treatment of Bond's proposal is correct, the Partnership's failure to respond adequately to the argument that it could protect itself from falling outside the 5% Safe Harbor by refusing to recognize the transfers it believes would place it outside the 5% Safe Harbor undermines this argument. The Partnership, it appears, may be able to cure its concern simply by refusing, pursuant to its right under Section 13.1.2 of the Partnership Agreement, to recognize any transfers presented to the Partnership in the second year.

### (ii) The Partnership's Claim that Bond's Mini–Tender Offer Would Depress and Quash the Marketability of the Partnership's Units

■ Second, the Partnership argues that Bond's mini-tender offer would be adverse to the Partnership even if the Partnership could avoid adverse tax consequences by stopping transfers once the 5% limit were reached and even if plaintiff's proposed practice of putting BUC$ tendered into its offer that would cause the Partnership to exceed its 5% limit into its "hip pocket" and then presenting them to the Partnership in the next year as a part of that year's 5% limit. The Partnership claims that Bond's mini-tender offer could preclude BUC$holders who want to transfer their units outside of Bond's mini-tender offer—for example, at secondary market prices superior to Bond's mini-tender price—for periods of as long as eleven months. The Partnership then argues that removing the Partnership's units from the marketplace for as long as eleven months could seriously depress and even quash the marketability of the Partnership's units in the long term (i.e., even beyond the eleven-month time frame) since the Partnership would lose visibility in the secondary market and buyers may be per-manently discouraged from seeking to acquire the Partnership's units.

Again, however, Bond fails to convince me that it is more likely than not that Bond's mini-tender offer would cause this outcome. Assuming that the BUC$holders fully subscribe to Bond's 4.9% mini-tender offer and that the percentage of BUC$ transferred on the secondary markets outside of Bond's mini-tender offer in the year of Bond's mini-tender offer is an atypically high 3%, the Partnership could transfer 1.9% of its outstanding BUC$ pursuant to Bond's mini-tender offer in the year the tender offer was made without falling outside of the 5% Safe Harbor. The following year, the Partnership could transfer 3% of its outstanding BUC$ pursuant to Bond's mini-tender offer and thus complete Bond's mini-tender offer. In that same year, another 1.9% of the Partnership's total outstanding interests could be transferred on the secondary markets without falling outside of the 5% Safe Harbor. According to the Partnership, over the past five years the Partnership has averaged 1.9% of its units being transferred each year (including an atypically high percentage of transfers in the past year of 3%). If the purchase and sale of 1.9% of the outstanding BUC$ each year over the past five years has been a sufficient amount of transfers to create the existing secondary market for the BUC$, I fail to see how, and the Partnership provides no explanation as to why the potential for the purchase and sale of 1.9% of the outstanding BUC$ in the year following Bond's mini-tender offer would depress or quash the marketability of the BUC$ in the long term. Furthermore, while it is possible that there could be BUC$holders who want to sell their BUC$ on the secondary market and are precluded because of the Partnership's desire to comply with the 5% Safe Harbor, that harm is specific to the particular BUC$holders who may be precluded from selling their BUC$ on the secondary market and does not harm the Partnership as a whole, as required by the "improper purpose defense." Finally,

Bond presents no evidence that even if BUC$holders were precluded from selling their BUC$ for eleven months, that the market for BUC$ would be quashed or depressed. This claim amounts to mere speculation.

### (iii) The Partnership's Claim that Bond's Mini–Tender Offer Would Violate Federal Securities Law

Third, the Partnership argues that Bond's proposed purpose is adverse to the interests of the Partnership as a whole because Bond's mini-tender offer would violate the federal securities law. In support of this position, Bond has introduced into evidence an expert legal opinion which states that Bond's mini-tender offer, in its current state, would violate federal securities laws because it is deceptive and coercive. While a deceptive and coercive tender offer may adversely affect individual BUC$holders who tender their BUC$ into Bond's offer, the Partnership fails to explain and I fail to understand how a deceptive and coercive tender offer could adversely affect the Partnership as a whole. As in the corporate context where a shareholder's tender offer's compliance with federal securities laws is not an issue in determining whether the shareholder has a right to a list of the corporation's shareholders,[49] Bond's mini-tender offer's lack of compliance with the federal securities law has no bearing on whether Bond should be granted a copy of the Investor List pursuant to its contractual right to that list, in the absence of evidence that Bond's legally deficient tender offer would be adverse to the interests of the Partnership as a whole. I do not consider, furthermore, the Partnership's contractual right under Section 13.1.3 of the Partnership Agreement to withhold consent for the transfers of BUC$ when the transfers would violate federal securities law[50] to permit the Partnership to deny Bond its contractual right to the Investor List. Rather, the Partnership's contractual right under Section 13.1.3 is triggered when transfers pursuant to the mini-tender offer are actually proposed to the Partnership for the Partnership's consent.

### (iv) The Partnership's Claim that Bond's Mini–Tender Offer Would Be a Violation of Bond's Fiduciary Duties

Fourth, the Partnership seems to argues that Bond's mini-tender offer would be adverse to the interests of the Partnership because the coercive and deceptive nature of Bond's mini-tender offer would result in a breach of Bond's fiduciary duty to the limited partners and BUC$holders. Relying on this Court's opinion in *K.E. Property Management, Inc. v. 275 Madison Management Corp.*,[51] the Partnership maintains that Bond owes a fiduciary duty to the limited partners and BUC$holders. The Partnership, however, is misguided in its reliance on *K.E. Property Management.* In deciding whether a limited partner of a Delaware limited partnership owed a fiduciary duty to the general partner when removing the general partner pursuant to its contractual right under the partnership agreement, this Court in *K.E. Property Management* merely stated that "to the extent that a partnership agreement empowers a limited partner discretion to take actions affecting the governance of the limited partnership, the limited partner may be subject to the obligations of a fiduciary, including the obligation to act in good faith as to the other partners."[52] In making this ruling, the Court relied on the proposition that under the Delaware

---

**49.** *See Mite Corp. v. Heli–Coil Corp.,* Del. Ch., 256 A.2d 855, 856 (1969) (finding that the absence the Securities and Exchange Commission's approval of a tender offer is irrelevant in a proceeding under 8 *Del.C.* § 220).

**50.** *See supra* pp. 847–48.

**51.** Del. Ch., C.A. No. 12683, mem. op., Hartnett, V.C., 1993 WL 285900 (July 27, 1993).

**52.** *Id.* at 24.

Uniform Partnership Act all partners owe each other fiduciary obligations.[53] The Court relied on this proposition because the Delaware Revised Uniform Limited Partnership Act does not specifically state whether a limited partner owes a fiduciary duty to a general partner and in such instances refers the Court to the DUPA.[54] It is clear, however, through the Court's qualification of its ruling, that the *K.E. Property Management* Court was not adopting that proposition in its entirety but was limiting it to situations in which a "partnership agreement empowers a limited partner discretion to take actions affecting the governance of the limited partnership."[55]

 Unlike the partnership agreement in *K.E. Property Management*, the Partnership Agreement does not grant BUC$holders any rights to take actions affecting the governance of the Partnership. Furthermore, Bond's mini-tender offer for 4.9% of the outstanding BUC$ will have no effect on the governance of the Partnership since, at this time, Bond only owns 5 of the 38,125 outstanding BUC$, and Bond's mini-tender offer is for only 4.9% of the Partnership's outstanding BUC$. In any event, Bond stipulated in the Pre–Trial Stipulation § II(L) that its proposed mini-tender offer would not affect the control of the Partnership. Finally, a fiduciary is typically one who is entrusted with the power to manage and control the property of another.[56]

As the holder of 5 BUC$ and in the absence of a provision in the Partnership Agreement granting BUC$holders the right to manage or control Partnership property, Bond stands in no such relationship to the other limited partners. Bond's mini-tender offer is akin to a minority shareholder making a mini-tender offer for a corporation's stock—an action to which fiduciary duties would not normally apply.[57] Therefore, in the absence of any provision in the Partnership Agreement engrafting fiduciary duties onto Bond,[58] I conclude that Bond owes no fiduciary duties to the other limited partners or the other BUC$holders.

Because the Partnership fails to prove by a preponderance of the evidence that disclosure of the Investor List to Bond pursuant to Bond's contractual right would be adverse to the interests of the Partnership as a whole, I cannot deny Bond access to the Investor List on the basis of the "improper purpose defense."

**C. The Partnership's Request that this Court Impose Conditions on Bond's Access to and Use of the Investor List**

 The Partnership argues that this Court should impose conditions on Bond's access to and use of the Investor List. The Partnership maintains that the Court has the power to do so pursuant to its equitable powers to shape the appropriate remedy and its power to prescribe any limitations or conditions with reference to

---

**53.** *Id.* at 23–24.

**54.** *Id.* (citing 6 *Del.C.* § 17–1105 stating, "[i]n any case not provided for in [the Delaware Revised Uniform Limited Partnership Act] the Delaware Uniform Partnership Law (Chapter 15 of [title 6]) and the rules of law and equity, including the law merchant, shall govern").

**55.** *Id.*

**56.** *Wilmington Leasing, Inc. v. Parrish Leasing Co., L.P.*, Del. Ch., C.A. No. 15202, mem. op. at n. 19, Jacobs, V.C., 1996 WL 752364 (Dec. 23, 1996).

**57.** *Gilbert v. El Paso Co.*, Del. Ch., 490 A.2d 1050, 1055–56 (1984) (finding that a hostile tender offeror who was a minority shareholder in the target corporation and that did not exercise actual control over the corporate affairs of the target, owed no fiduciary duty to the target's shareholders), *aff'd*, 575 A.2d 1131, 1148 (1990).

**58.** I note that neither this Court nor the Supreme Court has yet determined whether parties to a limited partnership agreement can contractually impose fiduciary duties on limited partners who otherwise have no power to manage or control the partnership. Since no such provision exists in the Partnership Agreement, I find it unnecessary to address that issue.

the obtaining of information under Section 17–305(e).[59] Specifically, the Partnership requests that I enter an order limiting Bond's tender offer to the acquisition of no more than three percent of the BUC$, requiring any tender offer made by Bond to include disclosure and withdrawal and proration rights consistent with federal securities laws, allowing the Partnership to mail the tender offer for Bond at Bond's expense, and requiring Bond to indemnify the Partnership, its investors, and the General Partner for any harm caused by its tender offer.

Given the fact that the Partnership has failed to convince me (i) that Bond's mini-tender offer and Bond's proposed limitation on the number of BUC$ it would present to the Partnership for transfer in any one given year would cause it to fall outside of the 5% Safe Harbor and (ii) that the Partnership would not be able to protect itself against falling outside of the 5% Safe Harbor by refusing to recognize transfers presented to it in the context of Bond's mini-tender offer, I do not find it necessary to limit Bond's mini-tender offer to 3% of the outstanding BUC$. For the same reason, I do not find it necessary or appropriate for me to condition Bond's use of the list on Bond indemnifying the BUC$holders, the Partnership and the General Partner from any harm caused by its tender offer.

■■■ As I stated above, whether Bond's mini-tender offer complies with federal securities laws is outside the scope of a determination of whether Bond is entitled to the list.[60] In the event that individual BUC$holders are harmed by a legally deficient mini-tender offer, their recourse will be against Bond under the federal securities laws. Furthermore, this Opinion in no way precludes the Partnership from exercising its right under Section 13.1.3 of the Partnership Agreement to refuse to recognize any transfers made pursuant to Bond's tender offer which, in the opinion of the Partnership's counsel, violate federal or state securities law.

■■■ Finally, the Partnership offers no persuasive reason and I fail to understand why I should require Bond to allow the Partnership, as opposed to Bond, to mail out the tender offer. The Partnership argues that allowing the Partnership to handle the mailing will protect the confidentiality of the Investor List and prevent it from being misused for other improper purposes. By making this argument, however, the Partnership suggests that this condition would mean that it would not have to provide Bond with a copy of the Investor List. As I have already found that Bond has a contractual right to the Investor List, subject of course to the "improper purpose defense," this condition, as Bond points out, would deny Bond the very right that I have determined it has when the Partnership has failed to meet its burden of proof under the "improper purpose defense." Furthermore, I am not convinced that allowing the Partnership to handle the mailing of the tender offer is the only way that the General Partner would be able to comply with its obligations under the federal securities laws.

I, therefore, decline to impose any conditions on Bond's contractual right to the Investor List.

## V. Conclusion

Bond has failed to demonstrate a statutory right to the Investor List pursuant to 6 Del.C. 17–305. Bond has established, however, its contractual right to the Investor List under the Partnership Agreement. The Court finds no basis to impose conditions on Bond's access to the Investor List.

**IT IS SO ORDERED.**

**59.** Section 17–305(e) provides that "[t]he Court of Chancery may, in its discretion, prescribe any limitations or conditions with reference to the obtaining of information, or award such other relief as the Court of Chancery may deem just and proper."

**60.** *See supra* p. 863.