# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TARNJIT SINGH GILL and JAGJIT SINGH GILL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2023-0349-BWD |
| REGENCY HOLDINGS, LLC, a Delaware limited liability company, | ) ) ) | |
| Defendant. | ) ) | |

## MASTER'S POST-TRIAL FINAL REPORT

Final Report: June 26, 2023
Date Submitted: June 21, 2023

David E. Ross and Roger S. Stronach, of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware, *Attorneys for Plaintiffs Tarnjit Singh Gill and Jagjit Singh Gill.*

Paul J. Loughman and Daniel M. Baker, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Reagan D. Pratt and Paul D. Flack, of PRATT & FLACK, Houston, Texas, *Attorneys for Defendant Regency Holdings, LLC.*

**DAVID, M.**

This post-trial final report resolves one of seven lawsuits involving siblings Tarnjit "Mitch" Singh Gill, Jagjit "Jag" Singh Gill, and Jagjit "Jackie" Kaur, their family company, Regency Holdings, LLC ("Regency," or the "Company"), and Regency's subsidiaries. Through this action, Mitch and Jag[1] seek an order to compel inspection of Regency's books and records pursuant to Section 18-305 of the Delaware Limited Liability Company Act.

For decades, Plaintiffs managed the family business alongside their father, who gifted them each 23.05% of the membership interests in the Company. After their father died unexpectedly in 2020, however, Plaintiffs' mother removed them from positions of authority at the Company and its subsidiaries and asked their sister, Jackie, to manage the Company, due to allegations that Plaintiffs had mismanaged and misappropriated the Company's assets. Those and related allegations are the subject of numerous lawsuits in the United Kingdom and Texas. Plaintiffs now seek books and records to evaluate the status of the business and financial condition of the Company, value their membership interests, and investigate potential wrongdoing. The Company has rejected the demand, asserting, among other defenses, that the gifts of membership interests Plaintiffs received from their father are invalid due to breaches of fiduciary duty, fraud, and undue influence, and that

---

[1] For clarity, this report refers to the parties by their first names, but no disrespect is intended.

1

Plaintiffs' true purposes are to gain a litigation advantage in the six other pending suits.

In this final report, I reiterate my prior ruling in discovery that this summary books and records proceeding is not the appropriate forum to litigate the validity of the underlying transactions through which Plaintiffs acquired their membership interests, and Plaintiffs are entitled to rely on the Company's membership ledger to establish their standing to demand books and records. I further conclude that Plaintiffs have stated proper purposes for seeking books and records; those purposes are their actual, primary purposes for making the demand; the Company cannot deny the inspection under Section 18-305(c); and Plaintiffs are entitled to inspect some, but not all, of the books and records they seek.

## I.    BACKGROUND

The following facts are drawn from the factual stipulations in the parties' pre-trial order, the deposition testimony of three witnesses that was submitted in lieu of live testimony at trial, and 95 joint trial exhibits.[2]

---

[2] The joint trial exhibits are cited herein as "JX __". The deposition testimony of Mitch Gill, Jag Gill, and Jackie Kaur, located at JX 86-88, is cited herein as "M. Gill at __", "J. Gill at __", and "J. Kaur at __", respectively.

Many of the facts presented at trial will be the subject of further litigation in the numerous other lawsuits the parties have filed. Where it is not necessary to my ruling to resolve these factual disputes, I do not, and instead summarize the parties' positions for context.

## A.     The Parties and Relevant Non-Parties

Regency is a Delaware limited liability company that serves as a holding company for subsidiaries that own and operate real estate assets in the United Kingdom and Texas.  These assets include airport property, residential and commercial rental properties, and a hotel.

Regency's founder, Jagmail Singh Gill ("Jack"), and his wife, Amarjit Gill, had three children—Plaintiffs Mitch and Jag, and their sister, Jackie.  Jack's father began the Gill family business in the 1950s as a clothing company in London.  Over the years, operations expanded to include real estate.[3]  In 1989, the family purchased the David Wayne Hooks Memorial Airport in Houston, Texas.[4]  In the late 2000s, Jack's brother passed away, prompting a "demerger" through which the business's assets were divided between Jack and his brother's heirs.[5]

Jack allocated portions of the Gill family assets to himself, Jag, Mitch, and Jackie, and kept others in the family portfolio.[6]  Jack then reorganized the portfolio assets with Regency as the holding company.  At the time of Regency's formation, Jack executed a limited liability company agreement to govern its operations (as

---

[3] J. Kaur at 198.

[4] M. Gill at 168.

[5] J. Kaur at 209.

[6] *Id*. at 209-10.

amended and restated, the "Operating Agreement"). Jack appointed himself and Mitch as Regency's two directors.[7] As reflected in a ledger of membership interests attached to the Operating Agreement, Jack owned 100% of the membership interests in the Company.[8]

The Operating Agreement requires that Regency maintain "[p]roper and complete records and books of account of the business of the" Company "on a basis consistent with . . . treatment [as a disregarded entity for United States income tax purposes] and on the same basis utilized in preparing the [Company]'s United States federal income tax (if required)." JX 3, Operating Agreement §§ 13(b), (d). Under the Operating Agreement, "[t]he Member and its duly authorized representatives may, for any reason reasonably related to its interest as a member of the [Company], examine the [Company]'s books of account and make copies and extracts therefrom at its own expense." *Id*. § 13(e).

---

[7] JX 3, Operating Agreement § 6 ("[T]he business and affairs of the Company shall be managed exclusively by a Board of Directors[.] . . . The number of Directors who shall serve on the Board shall be two (2) . . . . The initial Directors, who are hereby elected by the Member, shall be Jagmail Singh Gill [Jack] and Tarnjit Singh Gill [Mitch], each of whom shall serve as a Director until his or her successor has been elected and qualified or until his or her earlier death, resignation or removal, as the case may be.").

[8] The Operating Agreement provides that "[t]he Company shall maintain records of Membership Interests and certificates in the books and records of the Company." JX 3, Operating Agreement § 10(d).

**B.    The Role of the Gill Siblings in the Management of Regency's Businesses**

Regency wholly owns three subsidiaries—Glissen Properties Ltd. (a U.K. entity), Transomas Investments Ltd. (a U.K. entity), and Jetson Properties Ltd. (an Isle of Man entity).  Jetson Properties Ltd. wholly owns West Properties Holdings Ltd. (a U.K. entity) ("West Properties"), which, in turn, wholly owns Transomas Ltd. (a U.K. entity), as well as 49% of Gill Aviation Inc. (a Texas entity).  West Properties is also a 48.51% limited partner, and Gill Aviation Inc. is the general partner, of Northwest Airport Management LP (a Texas entity) ("Northwest Airport").  The following graphic illustrates that organizational structure:



Plaintiffs refer to the U.K. entities collectively as the "Regency Companies" and the two Texas entities as the "Airport Companies."

After Plaintiffs obtained degrees (Jag with a master's degree in tax and Mitch with a bachelor's degree in finance), they joined the family business.[9] Mitch eventually became responsible for managing the Regency Companies in the U.K. In addition to serving as a director of Regency, he served as a director of Glissen Properties Ltd., Transomas Investments Ltd., West Properties, and Transomas Ltd.

Jag became responsible for managing the Airport Companies in Texas. Jag served as a director of Gill Aviation Inc. and became President of Northwest Airport, which expanded from an airport asset to also include a hotel, residential properties, and commercial properties leased to government agencies.

In the eight years preceding the events in this action, Jackie, who holds a B.S. in Economics and International Relations from the London School of Economics and a law degree from the University of Houston,[10] was not involved in Regency's businesses.

---

[9] M. Gill at 168.

[10] J. Kaur at 199, 202.

**C.    Jack Assigns Membership Interests in the Company to Plaintiffs.**

On April 5, 2018, Jack executed two Assignment Agreements to "assign and transfer" membership interests of the Company to each of Mitch and Jag. Those Assignment Agreements state, in part:

> WHEREAS, the Assignor [Jack] currently owns a certain percentage Membership Interest in REGENCY HOLDINGS, LLC, a Delaware limited liability company (the "Company"), after taking into account a contemporaneous transfer of a percentage of his Membership Interest in the Company to [Mitch and Jag];

> WHEREAS, the Assignor wishes to assign and transfer to Assignee, as a gift, an amount of his Membership Interest in the Company having an aggregate fair market value, as finally determined for United States federal gift tax purposes, equal to Five Million Six Hundred Thousand Dollars ($5,600,000.00), the transferred Membership Interest in the Company is referred to herein as the "Subject Interest";

> WHEREAS, the Assignor wishes that the Assignee shall become a Member in the Company in his own right;

> WHEREAS, pursuant to Section 17 of the Amended and Restated Limited Liability Company Operating Agreement of the Company (as may be further amended from time to time, the "Operating Agreement"), a Member may assign in whole or in part their Membership Interests, and the transferee shall be admitted to the Company as a Member upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of the Operating Agreement, which instrument may be a counterpart signature page to the Operating Agreement;

> WHEREAS, the Assignee is willing to accept the Subject Interest pursuant to the terms set forth herein and in the Operating Agreement.

> NOW THEREFORE, the undersigned hereby agree as follows:

1.      The Assignor hereby assigns and transfers to the Assignee a portion of the Assignor's Membership Interest in the Company equal in value, as finally determined for United States federal gift tax purposes, to Five Million Six Hundred Thousand Dollars ($5,600,000.00) . . . .

4.      The Assignee hereby agrees to be bound by all of the provisions of the Operating Agreement as a Member (with respect to the Subject Interest) and by its execution of this Assignment Agreement hereby delivers a counterpart signature page to the Operating Agreement as confirmation that the Assignee shall be bound by all the terms and conditions of the Operating Agreement as a Member. . . .

6.      The Assignor, as Director of the Company, agrees to amend the ownership schedule attached as Exhibit A to the Operating Agreement, and also to issue new Membership Certificates to himself and the Assignee, upon a final determination of the Assignee's percentage Membership Interest in the Company resulting from the assignment under this agreement.[11]

On June 6, 2018, Jack and Plaintiffs executed addenda to the Assignment Agreements agreeing that, based on an appraisal, the $5.6 million gifts to Plaintiffs each represented a 17.55% membership interest in the Company.[12]  On December 15, 2018, Jack and Plaintiffs executed additional addenda to the Assignment Agreements voiding the prior addenda and agreeing that, based on a revised appraisal, the $5.6 million gifts to Plaintiffs each represented a 23.05% membership interest in the Company.[13]

---

[11] JX 9 at 0001-2.

[12] *Id*. at 0004.

[13] *Id.* at 0006.

Also on December 15, 2018, Jack and Mitch, as Regency's directors, executed a Resolution by Consent of the Directors of Regency Holdings, LLC, dated December 15, 2018, resolving to amend the ownership schedule attached to the Operating Agreement as set forth in Exhibit A. Exhibit A is a ledger of "Percentage Interests of the Members and Status of Membership Certificates" reflecting Jack, Mitch, and Jag's respective 53.9%, 23.05% and 23.05% interests in the Company.[14] The directors also resolved to issue membership certificates as reflected in Exhibit B, which attaches membership certificates issued to Jack, Mitch, and Jag reflecting those same membership interests.[15]

### D. Amarjit Reviews the Company's Finances Following Jack's Death.

Tragically, on April 2, 2020, Jack suddenly passed away from COVID-19.[16] Jack's property—including his majority membership interests in Regency—passed to his wife, Amarjit.

After Jack's death, Jackie assisted Amarjit with reviewing her finances. Jackie testified that when she did, she discovered that Plaintiffs had misappropriated Company assets and engaged in self-dealing transactions.[17] For example, Jackie

---

[14] JX 11 at 0003.

[15] *Id*. at 0004-7.

[16] M. Gill at 203; J. Gill at 192-93; J. Kaur at 212-13.

[17] J. Kaur at 237-40.

claims that she found Transomas Investments Ltd. had incurred a £10 million debt with the Bank of Singapore that was used to fund renovations at the Westbourne Hyde Park hotel, an asset that Mitch purportedly purchased from Transomas at an unfair price in 2015.[18] Jackie further asserts that Mitch had been using revenues from Transomas to pay his own hotel staff.[19]

Jackie also discovered a "unique type of ledger"[20] in use at the Airport Companies. Plaintiffs explain that while Jack was in charge of the business, the Gill family extensively used "lines of credit," through which "money [was] taken out of the airport" by a family member "for non-airport purposes"; that expense was recorded and "attributed to that person's line of credit"; the line of credit "would then be a loan outstanding and a receivable for the airport"; and "[f]rom time to time . . . when [Jack] saw fit, he would then agree to write those lines of credit off . . . and those would be recorded in tax returns . . . ."[21] Plaintiffs claim that this "line of credit system" was "scrupulously tracked" and approved by their father, and that it compensated Jag for the nominal salary he was paid, rewarded family members (including Plaintiffs) for good performance, and was consistent with their father's

---

[18] M. Gill at 191.

[19] Def.'s Answering Pre-Trial Br. [hereinafter, "AB"] at 5, Dkt. 69.

[20] Pls.' Op. Pre-Trial Br. [hereinafter, "OB"] at 9, Dkt. 68.

[21] M. Gill at 219-20.

intentions that "'[o]ne day, Sons, this will all be yours.'"[22]  Jackie believes that through the "line of credit" system, Jag misappropriated over $9 million from the Company in the 10 years before his father's death, and absconded with another $800,000 in the first eleven months after Jack's death.[23]  Jackie also maintains that Jag misappropriated $2.25 million in "developer commissions" and "management fees," and challenges additional fees paid for trusts and estate planning that solely benefitted Plaintiffs.[24]

### E.     Amarjit Makes Changes at the Company and its Subsidiaries.

In the months following Jack's death, Amarjit decided to remove Plaintiffs from positions of authority at Regency and asked Jackie to step in and manage the Company and its subsidiaries in their place.

In June and July 2020, Amarjit appointed Jackie as a director of Glissen Properties Ltd., Transomas Investments Ltd., West Properties, and Transomas Ltd.[25]

---

[22] OB at 10 (citing M. Gill at 222).  *See also* M. Gill at 221 ("[H]ad my dad not passed away unexpectedly, Regency was going to be a hundred percent owned by myself and Jag. . . .  So, yeah, on occasion, monies were written off, but it was done . . . in the family business, and it was pattern and practice for many years.").

[23] AB at 2 ("Jag's 'system' was to use airport funds to pay every personal expense he ever had, whether it be for his mortgage, his property taxes, his income taxes, his children's private school tuitions, or jewelry, in addition to his personal credit card charges that commonly ran to $30,000 per month.").

[24] *Id*. at 2-3.

[25] Pre-Trial Stip. and Order [hereinafter, "PTO"] ¶ 15, Dkt. 76.

On December 16, 2020, Amarjit executed an "Action by Personal Representative of Jagmail Singh Gill," purporting to "exercise [Jack]'s rights under the Operating Agreement to remove [Mitch] as a director of the Company and to replace him as a director of the Company with [Jackie]," and to "elect [her]self as a director of the Company as the successor director to [Jack]."[26] Recitals in the Action by Personal Representative explain that Jack's will "le[ft] his entire U.S. Estate to" Amarjit and appointed her as executor, and further state that "Section 18-705 of the Delaware Limited Liability Company Act provides that if a member who is an individual dies the member's personal representative may exercise all of the member's rights for the purpose of settling the member's estate or administering the member's property."[27]

Plaintiffs dispute the validity of the Action by Personal Representative, arguing that it is unsettled law whether the personal representative of an estate has authority to remove directors under 6 *Del. C.* § 18-705.[28] Nevertheless, Plaintiffs acknowledge Amarjit's wishes that Mitch be removed as a director, and explain that Mitch "worked to ensure a smooth transition" by providing Jackie with the

---

[26] JX 41 at Recital D.

[27] *Id*. at Recitals A, C.

[28] OB at 19 n.14.

12

Company's records.[29]  Mitch also resigned as a director of Glissen Properties Ltd., Transomas Investments Ltd., West Properties, and Transomas Ltd. by February 19, 2021.[30]

In May 2021, Amarjit gifted her 51% interest in Gill Aviation Inc. to Jackie.[31] Jackie then removed Jag as director of Gill Aviation Inc., elected herself sole director effective June 25, 2021, "seized the . . . buildings and its records," and reduced Jag's visibility into the Airport Companies' operations.[32]

### F.     The Parties File Lawsuits in the U.K. Business Court.

In the summer of 2021, Jackie demanded that Plaintiffs repay amounts that she contends were misappropriated from the Company.[33]  A barrage of lawsuits followed.  First, Mitch's company, Kheri Trading Limited ("KTL"), sued Regency's Transomas subsidiaries in the High Court of Justice, Business and Property Courts of England and Wales ("U.K. Business Court"), seeking to compel Transomas to release a lien on the Westbourne Hyde Park hotel.[34]  A few months later, the Transomas subsidiaries sued KTL and Mitch in the U.K. Business Court, seeking to

---

[29] *Id*. at 18.

[30] PTO ¶ 16.

[31] J. Gill at 196.

[32] *Id*. at 197.

[33] OB at 20; JX 45-48.

[34] PTO ¶ 20.

rescind the sale of the hotel and to recover £4.5 million that Mitch allegedly used for the benefit of his own companies.[35]

In September 2022, Mitch, KTL, and Gill London I Limited (a company owned by Jag) sued Jackie, the Transomas subsidiaries, and Whitechurch Lane Limited (another company owned by Amarjit) in the U.K. Business Court, asserting claims for debts allegedly owed by Jack's estate, Amarjit's company, and the Transomas subsidiaries under certain oral loans.[36] In October 2022, the Transomas subsidiaries sued Lime Green Investments Limited and Kheri Properties Limited (companies owned by Mitch) in the U.K. Business Court for over £600,000 in unpaid interest on debts owed under promissory notes.[37]

### G. Plaintiffs Discover "Suspicious" Transfers at the Airport Companies.

Plaintiffs claim that about one year after Amarjit transferred management control of Regency to Jackie, they began to suspect that Jackie was engaged in wrongdoing at the Company. They deny that their suspicions were prompted by Jackie's investigation into their own alleged wrongdoing.

---

[35] *Id.* ¶ 21; JX 55.

[36] PTO ¶ 22; JX 62.

[37] PTO ¶ 23; JX 64.

Instead, Plaintiffs contend that beginning in 2022, "decisions that at first might be chalked up to a difference in management style appeared to escalate to mismanagement and even potential misappropriation."[38] Mitch testified that "the number of staff members [Jackie] was employing" was "not the way [his] father would have managed things" because "[h]e would have been a bit more careful with the money."[39] He also claims that Jackie was "very aggressive and belligerent" with the Bank of Singapore when she "failed to comply with their on-boarding," and Mitch was concerned that the £10 million loan could be foreclosed upon if Jackie did not comply.[40]

Additionally, before his access to Northwest Airport's bank accounts was suspended, Jag observed that transfers totaling approximately $2.4 million had been made from Northwest Airport to West Properties. According to Plaintiffs, the Airport Companies had never transferred funds to any Regency company, and West Properties had no apparent need for cash since it does not have operations, payroll, or expenses.[41] Mitch testified that months later, in November 2022, a former Company employee told him that Jackie was "running the bank accounts dry" and

---

[38] OB at 21.

[39] M. Gill at 211.

[40] *Id*. at 211-13.

[41] *Id*. at 187-88.

"spending all the money" "on the lawyers."[42]  Separately, Jag testified that Jackie told him she "do[es]n't care how much money [she] spend[s] because it's not [her] money."[43]

Jag also observed that on May 13, 2022, the Company made a $600,000 payment to the I.R.S. to pay a tax penalty owed by Jack's estate,[44] and on May 17, 2022, a $170,838.71 payment was made to Jackie's personal account.[45]

### H.      Plaintiffs Serve the Demand.

On May 24, 2022, Plaintiffs, through counsel, sent a demand to the Company pursuant to 6 *Del. C.* § 18-305 (the "Initial Demand"), seeking to inspect six categories of books and records of the Company and certain of its subsidiaries,[46] explaining that, "[b]y virtue of Messrs Gill's positions as Members in Regency they are entitled to receive information relating to the running of the Regency Companies under both Delaware law and the relevant operating agreements."[47]

The six categories of documents sought in the Initial Demand included:

---

[42] M. Gill at 133, 213-14.

[43] J. Gill at 157.

[44] *Id*. at 200; JX 74 at 0001.

[45] JX 74 at 0002.

[46] Plaintiffs no longer seek books and records of Gill Aviation Inc. or Northwest Airport Management, L.P.  PTO ¶ 35.

[47] JX 57 at 0001.  The Company contends that the Initial Demand was not properly served in accordance with the statute.

16

1. All financial statements, profit and loss statements, and general ledgers;

2. All loan accounts (including at least directors' or shareholder's loans);

3. Copies of all bank and account statements;

4. Copies of all payroll records;

5. Copies of any tax returns.

6. Copies of all correspondence with [the Company's accountants,] Perry Patel and/or Silver Levene[.][48]

The Initial Demand also sought "confirmation" of the following information:

1. Whether any loans have been advanced to Jackie Kaur or Amarjit Kaur, or related parties;

2. Details of any payments, distributions, or dividends paid to or made on behalf of or to Jackie Kaur, Amarjit Kaur or related parties; or

3. All payments made to any of the following and the details thereof:
   a. accountants;
   b. legal advisors; and/or
   c. any further professional advisors, including but not limited to any payments made to Perry Patel and/or Silver Levene;

4. The Regency Companies' current assets and liabilities; and

5. Confirmation of any related-party transactions undertaken.[49]

---

[48] *Id*. at 0002.

[49] *Id*. at 0002.

On June 7, 2022, Plaintiffs, through counsel, sent the Company a second demand letter that was nearly identical to the Initial Demand.[50]

On September 28, 2022, Plaintiffs, through new counsel, served a "renewed demand" on the Company pursuant to 6 *Del. C.* § 18-305 (the "Demand"), seeking to inspect the same categories of books and records of the Company sought in the Initial Demand, for the following stated purposes:

> (1) evaluating the status of the business and financial condition of the Regency Companies; (2) investigating improprieties in the corporate governance, regulatory compliance, reporting, and controls of the Regency Companies, including but not limited to the purported removal of Mitch Gill as Director and manager; (3) investigating mismanagement of the Regency Companies; (4) understanding the current cash financial position of the Regency Companies; (5) evaluating their substantial membership interests in the Regency Companies; and (6) evaluating the propriety of any transfers of funds from the Regency Companies to accountants, legal advisors, and/or any other professional advisors.[51]

Like the Initial Demand, the Demand states that, "[b]y virtue of Messrs. Gill's positions as Members in Regency, they are entitled to receive information relating to the running of the Regency Companies under both Delaware law and the relevant operating agreements." [52]   Unlike the Initial Demand, the Demand further asserts

---

[50] JX 58.

[51] *Id*. at 4.  The Demand also seeks to confirm "[w]hether any transactions have taken place with Regency Holding I, LLC, and the details thereof."  *Id*.

[52] *Id*. at 2.

that, "by virtue of his position as Director and manager of Regency, Mitch Gill is afforded 'the right to examine all of the information described in [6 *Del. C.* § 18-305(a)] for a purpose reasonably related to the position of manager.'"[53]

## I. Procedural History

On March 21, 2023, Plaintiffs filed their Verified Complaint to Compel Inspection of Books and Records (the "Complaint").

Ten days after the Complaint was filed, on March 31, 2023, Amarjit sued Plaintiffs in Probate Court No. 3 of Harris County, Texas, seeking a declaration that Plaintiffs do not own valid membership interests in Regency or Northwest Airport (the "Texas Probate Action"). The complaint in the Texas Probate Action alleges that prior to Jack's death, Jack and Amarjit entrusted Mitch and Jag to consult with their attorneys and financial advisors concerning the structuring of their personal estates to minimize their exposure to estate and inheritance taxes.[54] In 2017, when the U.S. government increased the amount of the gift and estate tax "Applicable Exclusion Amount," Mitch and Jag "used this as an excuse" to claim that Jack and Amarjit's consultants and attorneys had advised them to gift membership interests in Regency to Plaintiffs, which led to Jack executing the Assignment Agreements.[55]

---

[53] *Id.*

[54] JX 75 ¶¶ 18-19.

[55] *Id.* ¶ 27.

The complaint asserts that "[s]ince Mitch and Jag placed themselves in a position in which their self-interest would conflict with their obligations as a fiduciary, the resulting transactions were presumptively unfair and void."[56]

This action was reassigned to me on April 4, 2023.[57] At that time, in a letter to counsel, the Chancellor directed the parties to "confer on a schedule designed to resolve this action before the Master within sixty days and submit a proposed schedule within one week," stayed exceptions to interlocutory reports, and advised "that pleading-stage motions are generally disfavored by this court in summary proceedings" and "[t]he assigned Master is likely to deny a proposed schedule that contemplates case-dispositive motions unless the parties demonstrate that there is a compelling need or extraordinary circumstances." Dkt. 7.

On April 11, 2023, the parties filed letters attaching competing scheduling orders. Plaintiffs' proposed schedule contemplated a one-day trial in June. The Company proposed a briefing schedule on a motion to dismiss or stay, arguing "that this action is nothing but an impermissible attempt to interfere with the jurisdiction

---

[56] *Id.* ¶ 40.

[57] On April 4, 2023, Jag, purporting to act derivatively on behalf of Northwest Airport, sued Jackie and Gill Aviation, Inc. in the District Court of Harris County, Texas. JX 76. The next day, on April 5, 2023, Northwest Airport sued Jag, Mitch, and related parties for debts allegedly owed under their lines of credit in the District Court of Harris County, Texas. JX 77.

and discovery rules of the courts [in the U.K. and Texas] already hearing [these] disputes."[58]  On April 12, 2023, I held a scheduling conference during which I largely granted Plaintiffs' proposed trial schedule, while leaving open the possibility for parallel briefing on the Company's motion to stay, explaining:

> As the Chancellor, I think, made pretty clear in her letter when she was reassigning this case to me, case dispositive motions in summary proceedings are generally disfavored.  And the arguments previewed in defendant's letter submitted last night are defenses commonly raised in books and records cases that are most appropriately presented in pretrial briefing rather than in a preliminary motion.  So I am not going to permit case dispositive motions in this case, including a motion to dismiss.  Nothing will preclude the defendants from raising all of their arguments in support of dismissal in their pretrial briefs.  That includes arguments about standing, the defendant's position that the plaintiffs are impermissibly seeking records of subsidiaries, that the filing of other lawsuits established a lack of a proper purpose, or whatever other arguments the defendants come up with.
>
> The defendant's letter last night also previewed argument for a stay of this litigation in favor of other litigation filed in other courts.  I'm not going to preclude the defendant from filing a motion to stay.  . . .  A deadline for the motion and a response can be built into the [trial] schedule, but that should not delay any other dates in the schedule that have to proceed in parallel with all other deadlines.  . . .  I did review the letters last night.  And based on those letters, I'll be candid, I didn't really see a basis to stay what is designated by statute as a summary proceeding in favor of a later-filed litigation in another forum.  But I'm open.  And the parties are free to allocate their clients' resources to briefing a motion to stay if they think that that makes sense.[59]

---

[58] Dkt. 11 at 2.

[59] *Gill v. Regency Holdings, LLC*, C.A. No. 2023-0349-BWD, at 7-9 (Del. Ch. Apr. 12, 2023) (TRANSCRIPT).

On April 14, 2023, I entered a scheduling order setting a one-day trial for June 21, 2023.[60]  The Company did not move to stay.  The case proceeded to discovery. It did not go smoothly.

On April 28, 2023, Plaintiffs filed a Motion for Protective Order, seeking to limit extraordinarily broad discovery requests served by the Company, including requests to support the Company's standing defense that Jack's gifts of membership interests to Plaintiffs under the Assignment Agreements were invalid due to breaches of fiduciary duty, fraud, or undue influence.[61]  On May 2, 2023, following oral argument, I granted in part and denied in part the Motion for Protective Order, explaining that the Court would not decide the validity of the transactions through which Plaintiffs acquired their membership interests:

> [A]s articulated in *Pogue* [*v. Hybrid Energy, Inc*., 2016 WL 4154253 (Del. Ch. Aug. 5, 2016)], in a typical case, the stock ledger controls record stockholder status, and a stockholder may point to the stock ledger to show *prima facie* that she is, in fact, a holder of record.
>
> The [P]laintiffs here have made a *prima facie* case of standing. Exhibits B and C attached to the complaint evidence the membership interests held in the LLC.  The defendant argues it's not fair to rely on documents that were created when the plaintiff was a director, but defendant doesn't challenge the accuracy of the membership interests in those documents other than to challenge the validity of an underlying transaction through which the membership interests were transferred on

---

[60] Dkt. 16.

[61] Dkt. 28.

grounds of breach of fiduciary duty, fraud, undue influence, or similar theories.

Under that theory, the fiduciary duties that allegedly were breached were owed to Jack and Amarjit, not to the [C]ompany. So it's not even apparent to me that the [C]ompany has standing here to raise that as a defense. But what is clear to me is that it's not appropriate to have a mini trial-within-a-trial in seven weeks to adjudge the validity of a transfer of membership interests that occurred in 2018 on a limited record in order to assess the [P]laintiffs' standing to obtain books and records. A summary books and records proceeding is not the right vehicle to raise those arguments.[62]

On May 9, 2023, Plaintiffs filed a Motion to Compel, and on May 16, 2023, the Company filed a Motion to Compel and Motion for Protective Order. On May 16, 2023, following oral argument, I denied Plaintiffs' Motion to Compel and granted the Company's Motion to Compel and Motion for Protective Order.[63]

On May 19, 2023, a Friday afternoon, Plaintiffs filed an Emergency Motion for a Protective Order and for Clarification, in advance of depositions scheduled to begin Monday morning. That day, I denied the motion and provided additional guidance via two minute orders filed on the docket.[64]

A one-day trial on a paper record was held on June 21, 2023.

---

[62] *Gill v. Regency Holdings, LLC*, C.A. No. 2023-0349-BWD, at 36-38 (Del. Ch. May 2, 2023) (TRANSCRIPT).

[63] *See* Dkts. 54, 66.

[64] Dkts. 56-57.

## II. ANALYSIS

Section 18-305(a) of the Limited Liability Company Act affords members of a Delaware limited liability company the right to obtain books and records of the company "from time to time upon reasonable demand for any purpose reasonably related to the member's interest as a member of the limited liability company." 6 *Del. C.* § 18-305(a). Section 18-305(b) further provides that "[e]ach manager shall have the right to examine all of the information described in subsection (a) of this section for a purpose reasonably related to the position of manager." 6 *Del. C.* § 18-305(b). Section 18-305(e) requires that a demand for books and records "shall be in writing and shall state the purpose of the demand." 6 *Del. C.* § 18-305(e).

Inspection rights under Section 18-305 may be expanded or limited by the governing limited liability company agreement. The Operating Agreement provides that "[t]he Member and its duly authorized representatives may, for any reason reasonably related to its interest as a member of the [Company], examine the [Company]'s books of account and make copies and extracts therefrom at its own expense." JX 3, Operating Agreement § 13(e). The parties' arguments assume that this language is co-extensive with Section 18-305.[65]

---

[65] OB at 32; Pls.' Reply Br. [hereinafter, "RB"] at 1, Dkt. 72 ("Regency does not dispute . . . that Plaintiffs' rights are coterminous with the Act . . . ."). Although "[t]he phrase

The Company does not contest that the Demand complies with the form and manner requirements of Section 18-305. The Company does, however, contest that (i) Plaintiffs have standing as members or managers of the Company to obtain books and records; (ii) Plaintiffs have demonstrated a proper purpose reasonably related to their interests as members or managers of the Company; and (iii) Plaintiffs' stated purposes in making the Demand are their actual, primary purposes for seeking books and records. The Company further asserts that (iv) inspection may be denied because its manager believes in good faith that providing any books and records to Plaintiffs in response to the Demand would be adverse to the interests of the Company.

### A. Plaintiffs Have Demonstrated Standing to Obtain Books and Records as Members, But Not Managers, of the Company.

Entitlement to books and records under Section 18-305 is "status related"— under the statute, only a member or a manager may access the company's books and records. To demonstrate standing, Plaintiffs must establish their status as members or managers of the Company.

---

'books of account' is a less expansive term than 'books and records,'" the parties have not distinguished between entitlement to "books of account" under the Operating Agreement and "books and records" under the statute. *RED Cap. Inv. L.P. v. RED Parent LLC*, 2016 WL 612772, at *3 (Del. Ch. Feb. 11, 2016) (citing *Madison Real Estate Immobilien-Anlagegesellschaft Beschrankt Haftende Kg v. Kanam USA XIX Ltd.*, 2008 WL 1913237, at *12 n.91 (Del. Ch. May 1, 2008), and *Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C.*, 2002 WL 205681 (Del. Ch. Jan. 29, 2002)).

25

### 1. Plaintiffs' Standing as Members of Regency

The Company contends that Plaintiffs are not valid members because the Assignment Agreements through which they acquired their membership interests are invalid due to breach of fiduciary duty, fraud, or undue influence. Earlier in this litigation, the Company sought (but was denied) discovery to support its defense that Plaintiffs lack standing on that basis. The Company still seeks dismissal or a stay of this action in favor of the Texas Probate Action where Amarjit is currently challenging the validity of the Assignment Agreements.

I recommend denying the Company's request for dismissal or a stay for two reasons. First, as I explained in ruling on the Motion for Protective Order, this Court is not the appropriate forum "to challenge the validity of an underlying transaction through which the membership interests were transferred on grounds of breach of fiduciary duty, fraud, undue influence, or similar theories." *Gill v. Regency Holdings, LLC*, C.A. No. 2023-0349-BWD, at 36-38 (Del. Ch. May 2, 2023) (TRANSCRIPT). "Caselaw determining who is a stockholder or a holder of record under Section 220"—the corporate analog of Section 18-305[66]—"generally relies on the corporation's existing stock ledger." *Knott Partners L.P. v. Telepathy Labs, Inc.*,

---

[66] "'Delaware courts have interpreted Section 18-305 by looking to cases interpreting similar Delaware statutes concerning corporations and partnerships,' such as Section 220 of the Delaware General Corporation Law." *Riker v. Teucrium Trading, LLC*, 2020 WL 2393340, at *4 (Del. Ch. May 12, 2020), *judgment entered*, (Del. Ch. 2020).

2021 WL 5493092, at *4 (Del. Ch. Nov. 23, 2021). "In a typical case, the stock ledger controls record-stockholder status, and a stockholder may point to the stock ledger to show, *prima facie*, that she is in fact a holder of record." *Pogue*, 2016 WL 4154253, at *3. As a practical matter, this rule is essential, because "requiring an analysis of why and under what circumstances a [books and records] plaintiff came to hold [her interest in the company] could significantly complicate the nature of this summary and often expedited proceeding." *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *6 (Del. Ch. July 13, 2005).

Although the ledger is *prima facie* evidence of standing in a books and records proceeding, the Court may, in limited circumstances, look beyond the ledger where the *prima facie* case is rebutted by other evidence. *See Pogue*, 2016 WL 4154253, at *3 ("[I]nclusion on a stock ledger is *prima facie* evidence of stock ownership, but . . . the corporate defendant may rebut that presumption by clear and convincing evidence."). But the few cases in which the Court has considered evidence beyond the ledger to assess a standing defense have done so on narrow grounds, where the defense could be resolved based on factual admissions or contract interpretation.[67] For example, in *Pogue v. Hybrid Energy, Inc.*, the Court declined to rely on a ledger

---

[67] *See Knott Partners L.P.*, 2021 WL 5493092, at *4 (noting that "the Court seldom uses this authority [to look beyond the stock ledger], occasionally acknowledging its existence but typically declining to inquire beyond the ledger itself").

27

where the plaintiff *conceded* that the stock issuance through which he obtained his stock was void because it was not authorized under the corporation's certificate of incorporation.[68]  2016 WL 4154253, at \*1.  In *Prokupek v. Consumer Capital Partners LLC*, the Court dismissed a books and records action under Section 18-305 where it could determine as a "matter[] of contract interpretation" that the plaintiff "was no longer a member of [the company] when he demanded inspection."  2014 WL 7452205, at \*3-4 (Del. Ch. Dec. 30, 2014).

By contrast, this Court has declined to look beyond the ledger where doing so would effectively convert a summary books and records proceeding into a plenary action.  In *Holtzman v. Gruen Holding Corp.*, then-Vice Chancellor Chandler denied a similar motion to stay where the company argued that the plaintiff was not a "proper" stockholder entitled to inspection because he had breached contractual obligations under a stockholders agreement to tender his stock to the company.  1994 WL 444756, at \*2 (Del. Ch. Aug. 5, 1994).  An action in Pennsylvania was filed to

---

[68] In *Knott Partners L.P. v. Telepathy Labs, Inc.*, the Court held that where a corporation failed to update its stock ledger but conceded in documentation circulated outside the corporation that the same entity was in fact a stockholder as of that date, the corporation could not rely on the deficient ledger it controlled to deprive the stockholder of its inspection rights.  2021 WL 5493092, at \*5-6.  Given that Plaintiffs appear on the ledger here, that case is inapposite.

More recently, in *Handler v. Centerview Partners Holdings L.P.*, the Court permitted targeted discovery into partnership status in a books and records action where, unlike here, there was no partnership ledger to which the parties could refer.  2023 WL 1955151, at \*3 (Del. Ch. Feb. 13, 2023), *report and recommendation adopted*, (Del. Ch. 2023).

determine whether the plaintiff was "obligated to tender all of his stock in the company" under that agreement; according to the company, "[i]f that determination [wa]s ultimately made by the Pennsylvania court, [the plaintiff] would not be a stockholder entitled to demand inspection of books and records under 8 *Del. C.* § 220." *Id.* The Court denied the motion, explaining that "when a stock ledger exists and no other reason appears to question its authenticity or accuracy, our law has always accorded *prima facie* stockholder status to one whose name appears on such a ledger." *Id.*[69]

Here, Plaintiffs have produced two Assignment Agreements through which Jack assigned membership interests in the Company to Mitch and Jag, and a Resolution by Consent of the Directors of Regency Holdings, LLC, dated December 15, 2018, attaching a ledger and membership certificates reflecting Mitch and Jag's membership interests in the Company.[70] That evidence presents a *prima facie* case

---

[69] *See also, e.g.*, *Western Air Lines, Inc. v. Kerkorian*, 254 A.2d 240, 242 (Del. 1969) (affirming the Court of Chancery's holding that, where a plaintiff "proved that he was a stockholder of record" of the company, evidence that the plaintiffs acquired his shares in violation of federal law was "irrelevant" and could not defeat his inspection rights); *Odyssey Partners v. Trans World Corp.*, 1983 WL 20288, at *1 (Del. Ch. Mar. 21, 1983) (denying request to continue trial where the company argued it could not "be ready for trial on such short notice" because "its primary defense" was that the plaintiff had violated federal securities laws "in its effort to wage its proxy battle," holding that the Court would not "entertain any evidence at the hearing" about those alleged violations given the summary nature of a books and records action).

[70] JX 11.

of Plaintiffs' status as members of the Company. Aside from its theories that the gifts of membership interests under the Assignment Agreements are invalid, the Company has offered no evidence to rebut Plaintiffs' standing.[71]

Second, the Company's request to stay this action in favor of the Texas Probate Action "proceeds on a false premise." *Holtzman*, 1994 WL 444756, at *3. In that action, Amarjit seeks to invalidate the Assignment Agreements due to breach of fiduciary duty, fraud, and undue influence. "Even if one assumes" that the Texas Probate Action will ultimately invalidate the Assignment Agreements under those theories, "it remains undeniable that *as of now*" Plaintiffs are members of the Company, and their right to inspection "exists even though the possibility exists that [they] may later be divested of [their] [membership interests] in some other proceeding or be declared in some future proceeding to be holding [their] [interests] contrary to law or private agreement." *Id*. (emphasis added).

---

[71] Although a summary books and records action is not the appropriate forum to litigate breach of fiduciary duty theories, the Company is not foreclosed from raising *any* arguments to challenge Plaintiffs' *prima facie* standing as members. Plaintiffs anticipated one such argument in briefing—they acknowledge "potential blemishes" in the wording of the Assignment Agreements, which "assign," rather than "transfer," membership interests to Plaintiffs. Despite the inconsistent wording, Plaintiffs point out that the recitals in the Assignment Agreements reflect Jack's intention to transfer the interests such that Plaintiffs would be "admitted to the Company . . . as a member," JX 3 § 17, and that the Company's ledger was updated to reflect Plaintiffs' membership interests. JX 11. The Company has not pursued this argument, and it is therefore waived. *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

The Company argues otherwise, essentially claiming that the transfer of membership interests under the Assignment Agreements never occurred because Plaintiffs stood on both sides of the transaction, rendering the agreements "presumptively void."[72] Assuming the Company even has standing to challenge the validity of agreements to which it is not a party on grounds of breach of fiduciary duties owed to someone else, a gift to a fiduciary is not automatically "void." Rather, a gift to a fiduciary will "be presumed to be *voidable . . .* and [the recipient] has the burden of proving the fairness of the transaction." *In re Est. of Surian*, 1990 WL 100794, at *4 (Del. Ch. July 12, 1990) (emphasis added).[73] In other words, the "presumption" addresses who bears the burden of proving fairness; the transaction is nevertheless effective unless and until declared otherwise. For purposes of this action, "[a]ll that matters *presently* is that [Plaintiffs] [are] current record [members] and that [they] ha[ve] stated a proper purpose" for inspection. *Holtzman*, 1994 WL 444756, at *3 (emphasis in original).

---

[72] AB at 38.

[73] *See also Coleman v. Newborn*, 948 A.2d 422, 429 (Del. Ch. 2007) ("Upon the finding of a fiduciary relationship, the party seeking to sustain the transfer can overcome the presumption of fraud by showing the fairness of the transaction.").

Accordingly, Plaintiffs have met their burden to demonstrate by a preponderance of the evidence that they are members of the Company with standing to inspect its books and records.

## 2. Mitch's Standing as a Manager of Regency

Plaintiffs separately contend that Mitch is entitled to inspect books and records as a manager of the Company.[74]

On December 16, 2020, Amarjit executed an "Action by Personal Representative of Jagmail Singh Gill," purporting to "exercise [Jack]'s rights under the [Operating Agreement] to remove [Mitch] as a director of the Company and to replace him as a director of the Company with [Jackie]."[75] According to Plaintiffs, that action may have been invalid because it is an open question whether the personal representative of an estate has authority to remove directors under 6 *Del. C.* § 18-705.[76] Plaintiffs concede, however, that after Jack's death, Amarjit became the Company's majority member, and in that capacity, had the power to remove and

---

[74] Under the Operating Agreement, the managers of the Company are its directors. JX 3, Operating Agreement § 1(b) ("The Member has requested that all references to managers shall mean directors and therefore shall be changed to be called directors instead.").

[75] JX 41 at Recital D.

[76] OB at 35-36.

replace directors.[77] Moreover, Mitch's purported removal as a director of Regency occurred *two and a half years ago*, in December 2020.[78] Despite "question[ing]" the validity of his removal,[79] Mitch never took legal action to challenge it. Instead, Mitch complied with the "handover" of Company records to Jackie "because [his] mother asked [him] to do so"[80]; resigned as a director of Glissen Properties Ltd., Transomas Investments Ltd., West Properties, and Transomas Ltd.; and has not fulfilled the roles of a manager since.

For these reasons, Plaintiffs have not met their burden to prove by a preponderance of the evidence that Mitch is a manager of the Company.

---

[77] *See* M. Gill at 203 ("After my father passed away, that ownership interest in Regency would have passed on to my mother."); Compl. ¶ 12 ("Several months after his death, Jack's membership interests transferred to Amarjit."); *id*. ¶ 13 ("Several months after Jack's death, Amarjit became a member and 53.9% owner of Regency."). *See also* JX 3, Operating Agreement ¶ 6(d) ("Any incumbent Director may be removed and replaced at any time, with or without cause, by the Member.").

[78] *Cf. Simple Glob., Inc. v. Banasik*, 2021 WL 2587894, at *14 (Del. Ch. June 24, 2021), *judgment entered*, (Del. Ch. 2021) (explaining in the "Section 225 context, even a delay of a month and a half has been held sufficient to bar a claim under the doctrine of laches"); *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *20 (Del. Ch. Oct. 11, 2013) (holding plaintiff's seven-month delay in challenging his removal as a director was barred by laches).

[79] OB at 36.

[80] M. Gill at 205-6 (stating that Mitch agreed to cede control of the Company to Jackie "because [his] mother asked" and "out of respect and love for [his] mum, [he] . . . listened").

## B. Plaintiffs Have Established Proper Purposes for Inspection.

"To inspect books and records, a member of a Delaware LLC, like a stockholder of a Delaware corporation, must first establish by a preponderance of the evidence the existence of a proper purpose for inspection." *Sanders v. Ohmite Hldgs., LLC*, 17 A.3d 1186, 1193 (Del. Ch. 2011) (internal quotations omitted). A proper purpose is any purpose "reasonably related to the member's interest as a member." 6 *Del. C.* § 18-305(f)(2).

As explained below, Plaintiffs have established proper purposes for inspection of the Company's books and records.

### 1. Plaintiffs Have Stated Proper Purposes to Value their Membership Interests and Evaluate the Status of the Business.

Plaintiffs seek books and records for the purpose of "evaluating their substantial membership interests in the Regency Companies."[81] The Demand also "reformulates" the valuation purpose "in terms employed in the LLC Act"[82] by seeking to "evaluat[e] the status of the business and financial condition of the Regency Companies" and "understand[] the current cash financial position of the Regency Companies."[83]

---

[81] JX 61, Demand at 4.

[82] *Sanders*, 17 A.3d at 1193.

[83] JX 61, Demand at 4.

Under Delaware law, a member's desire to value her interests in the company—particularly where the company is privately held—"has long been held as a proper purpose" to inspect books and records. *Woods Tr. of Avery L. Woods Tr. v. Sahara Enterprises, Inc.*, 238 A.3d 879, 890 (Del. Ch.), *judgment entered sub nom. In re Woods v. Sahara Enters., Inc.* (Del. Ch. 2020) (citing cases). The Demand therefore states a proper purpose.

### 2. Plaintiffs Have Stated a Proper Purpose to Investigate Interested-Party Payments.

Plaintiffs also seek to "investigat[e] improprieties in the corporate governance, regulatory compliance, reporting, and controls of the Regency Companies," "investigat[e] mismanagement of the Regency Companies," and "evaluat[e] the propriety of any transfers of funds from the Regency Companies to accountants, legal advisors, and/or any other professional advisors."[84]

Under Delaware law, the desire to investigate mismanagement is a proper purpose. However, "[a] mere statement of a purpose to investigate possible general mismanagement, without more, will not entitle" a member to broad inspection relief. *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122 (Del. 2006). To establish a proper investigation purpose, a member "must present some evidence to suggest a credible basis from which a court can infer that . . . wrongdoing may have occurred."

---

[84] JX 61, Demand at 4.

35

*Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *10 (Del. Ch. Nov. 24, 2020), *judgment entered*, (Del. Ch. 2020).

The credible basis standard imposes "the lowest possible burden of proof." *Seinfeld*, 909 A.2d at 123. It does not require a member to prove that the wrongdoing "actually occurred." *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4 (Del. Ch. Apr. 28, 2004). It does not require a member "to show by a preponderance of the evidence that wrongdoing is probable." *Lebanon Cnty. Employees' Ret. Fund v. Amerisourcebergen Corp.*, 2020 WL 132752, at *8 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020). It requires only that a member "establish by a preponderance of the evidence that there is a credible basis to suspect a *possibility* of wrongdoing." *Pettry*, 2020 WL 6870461, at *11 (emphasis in original). That burden may be "'satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing.'" *Id.*

To demonstrate a credible basis to investigate mismanagement, Plaintiffs attempt to create an inference that Jackie has "run[] the bank accounts dry"[85] by secretly siphoning Company assets and forming new entities in which to hide them. To support that theory, Plaintiffs identify (i) two instances in which it appears Jackie

---

[85] M. Gill at 214.

used Company funds to pay personal expenses;[86] (ii) account statements showing approximately $2.4 million in transfers made from Northwest Airport to West Properties;[87] and (iii) two new "Regency" entities that were formed in November 2022.[88]

First, Plaintiffs cite account statements showing a $600,000 transfer to the I.R.S. to pay Jack's personal tax liabilities and another $170,838.71 transfer made directly to Jackie's personal account. The Company suggests that those payments do not evidence wrongdoing because "the airport had regularly paid Jack's tax liabilities before Jackie came along," and Plaintiffs have not demonstrated that the payment to Jackie "would represent an unreasonable salary for her two years as CEO, President, Secretary, and sole director" of Northwest Airport.[89] Whether characterized as the investigation of possible wrongdoing or as an independent proper purpose, "how directors and senior officers are compensated and whether they are the beneficiaries of any related-party transactions are basic facts that stockholders are entitled to know." *Woods*, 238 A.3d at 900. Plaintiffs have stated

---

[86] JX 74.

[87] M. Gill at 70; *id.* at 188; JX 73.

[88] JX 71.

[89] AB at 32.

a proper purpose to investigate payments made to or on behalf of the Company's managers, family members, or other interested parties.

Next, Plaintiffs contend that transfers from Northwest Airport to West Properties amounting to $2.4 million give rise to an inference of possible wrongdoing at the Company's subsidiaries[90] because West Properties had no legitimate need for the funds, never previously received funds from Northwest Airport, and did not have a line of credit with Northwest Airport.[91] The implication is that Jackie has engaged in a secret scheme to funnel millions of dollars out of the Company for illicit reasons, and Plaintiffs need "to understand what happened to the $2.4 million (and likely more) that Jackie took."[92] The suspicion Plaintiffs try to create around these transfers, however, is dispelled by their own repeated admissions

---

[90] The Company argues that seeking to investigate wrongdoing based on these transfers is improper because they are the subject of a lawsuit that Jag filed derivatively on behalf of Northwest Airport in Texas court days after this action was initiated. AB at 26. This argument mischaracterizes Plaintiffs' reasons for describing the transfers. Plaintiffs stipulate that they do *not* seek documents from Northwest Airport in this litigation. Instead, they assert that a pattern of mismanagement at Northwest Airport gives rise to a credible inference of wrongdoing at Regency's other subsidiaries, given that those subsidiaries are all managed by the same person.

[91] RB at 16; *see also* OB at 24. Plaintiffs also assert that if the transfers were "above-board 'distributions'" to West Properties, then Jag, as a partner of Northwest Airport, would have received a *pro rata* distribution, but he did not. The Company counters that Jag owes Northwest Airport an "eight-figure debt" and "it would be a long time before he would be entitled to cash, as opposed to credits against his debt." AB at 33.

[92] RB at 16; *see also* M. Gill at 214 (testifying that Plaintiffs need books and records "to get to the bottom of this to find out what's going on").

that the transfers apparently were used to fund the ongoing litigations. Indeed, Mitch testified that a former Company employee told him that Jackie was "running the bank accounts dry" and "spending all the money" "on the lawyers,"[93] and Plaintiffs sought injunctive relief in Texas premised on similar representations.[94] Given those concessions, the transfers Plaintiffs identify do not support a credible basis to suspect that Jackie has been secretly siphoning Company funds.

Finally, Plaintiffs point to evidence that two new entities bearing the "Regency" name—Regency Holdings I, LLC and Regency Holdings DE Inc.—were formed in November 2022.[95] Plaintiffs now agree that one of those entities, which was formed by an individual in Australia, "may in fact have been a coincidence,"

---

[93] M. Gill at 133, 211-14. Jag also testified that Jackie told him she "do[es]n't care how much money [she] spend[s] because it's not [her] money," but I am not convinced that this self-serving account of their conversation is credible. J. Gill at 155, 156.

[94] JX 92 ¶ 1 ("Jackie has withdrawn millions of dollars from NWAM's bank accounts to directly pay expenses and liabilities that have no legitimate business purpose for NWAM, as well as to fund her personal vendetta against Mitch and Jag"); id. ¶ 32 ("Jag and Mitch are concerned that Jackie is using her control of NWAM to divert its funds in order to cover the very considerable costs involved in the English Proceedings."); id. ¶ 38 ("A former employee working for Jackie recently told Mitch that Jackie had emptied Regency Holdings' bank accounts and 'spent all the money' in pursuing these claims driven by personal animosity. He indicated that Regency Holdings' bills—whether for company work or otherwise—could only be met by extracting funds from Regency Holdings' subsidiaries and transferring them to the UK. This is exactly what is happening with the unauthorized distributions from NWAM to West Properties.").

[95] JX 71.

but claim it is "still unclear" who formed the other.[96] Even assuming it was Jackie, the formation of a single entity, alone or in combination with the other arguments Plaintiffs have raised, does not give rise to a credible inference of possible wrongdoing.[97]

Accordingly, Plaintiffs have stated a proper purpose to investigate payments made to or on behalf of the Company's managers, family members, or other interested parties, but have not demonstrated a credible basis to investigate mismanagement more broadly.

### 3. Plaintiffs' Stated Purposes Are Their Actual, Primary Purposes.

The Company asserts that even if the purposes identified in the Demand are facially proper, they are not Plaintiffs' actual or primary purposes for seeking books and records of the Company.

"[O]nce a [member] has identified a proper purpose . . . the burden shifts to the corporation to prove that the [member]'s avowed purpose is not her actual purpose and that her actual purpose for conducting the inspection is improper."

---

[96] RB at 17.

[97] Plaintiffs also assert that they are entitled to books and records "to probe Jackie's continued engagement of a person [Mr. Patel] she says defrauded the Companies." RB at 24. Plaintiffs do *not* assert that *they* believe Mr. Patel defrauded the Company. Jag testified that "Perry Patel was an integral part of [the] family business," and Mitch testified that correspondence with Mr. Patel could provide "an objective opinion of what is going on." J. Gill at 221; M. Gill at 233-34. Instead, it appears Plaintiffs seek this information for impeachment purposes. This does not provide a credible basis to suspect wrongdoing.

*Woods*, 238 A.3d at 891. "[O]ur courts have given credence to such defenses only where it is evident from the facts on the record that the plaintiff's actual, predominating, purpose is something unrelated to the plaintiff's purpose as a stockholder." *Sutherland v. Dardanelle Timber Co.*, 2006 WL 1451531, at *9 (Del. Ch. May 16, 2006). "The issue of whether a concept so elusive as purpose or motive is 'primary' or 'secondary', involves a judgment that necessarily is qualitative, not mathematical." *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 166-67 (Del. Ch. 1987). If a member's primary purpose is proper, "any secondary purpose or ulterior motive of the [member] becomes irrelevant.'" *Riker*, 2020 WL 2393340, at *4.

Based on the evidence presented at trial, I find that Plaintiffs' stated purposes are, in fact, the primary purposes motivating the Demand. Mitch and Jag devoted their entire careers to running Regency and its subsidiaries alongside their father. They assert they are the owners of 46% of the Company. They do not trust their sister. It is eminently believable that after losing visibility into the operations of the companies they ran for three decades, Plaintiffs want to understand the status of the business, the value of their interests, and whether self-dealing has occurred.

Those purposes were borne out in each of Mitch and Jag's testimony. For example, Mitch testified that:

> [A]s an owner, a member, a director of Regency, I just want transparency, something that Jackie hasn't been giving me. So whether

41

it's about the prosecution, whatever she's not able to share with me under privilege or whatever it may be, I'm not asking for that. I'm actually asking for, what are the funds being used for? What's going on with the companies? And it's got nothing to do with these cases. All I want to know is, together with my brother as a 46 percent shareholder member and owner of Regency, we want to know what is going on with the company. Is that too much to ask?[98]

He further testified:

My books and records request is to understand what is going on in the company, how is it performing, how is [Jackie's] management going, is she a competent operator, is she kind of squandering money? I need to know all those questions. It's not specifically what you're talking about. You're narrowing it down, and I'm trying to say to you I just want generally to know how exactly is the company performing now that Jackie is operating it?

Prior, it was me in the UK and my brother in the U.S. And for many years, we knew exactly what was going on, and whatever was going on, Jackie has those documents and information. I've been shut out since 2020, and I want to be understanding how things are going. As an owner, I think I have that right.[99]

And again, Mitch explained:

[S]orry to state the obvious, but as an owner, a member, a director of Regency and for all the concerns I have in the payments that I see and the various other . . . explanations I've given, as a stakeholder in Regency, most notably an active member, owner, I want to know what's going on. And I want to know, is Jackie dissipating the value of what myself and my brother and even my mother [own].[100]

---

[98] M. Gill 100.

[99] *Id.* at 102-3.

[100] *Id.* at 237.

Jag similarly testified:

> I want to know the financial position of this entity, Regency, and its UK subsidiaries. We've talked about these cash flows between the U.S. and the UK subsidiaries, so I certainly want to know about the cash position in the UK and its subsidiaries, I want to know how do I evaluate my membership interest in Regency and is that appreciating or deteriorating? . . . I have no visibility to any of that, and so, I'm generally concerned about that . . . .[101]

The Company nevertheless raises several arguments in support of its position that Plaintiffs' stated purposes are not their actual or primary purposes for making the Demand. None carry the day.

First, the Company argues that Plaintiffs' valuation purpose is not genuine because Plaintiffs have failed to "identify a credible potential end use of a valuation."[102] "If a stockholder cannot identify a credible potential end use, then the court may infer that the stockholder's stated purpose is not its actual purpose." *Woods*, 238 A.3d at 893 (citing *Marathon P'rs, L.P. v. M & F Worldwide Corp.*, 2004 WL 1728604, at *8 (Del. Ch. July 30, 2004)). But that is not dispositive. Based on the evidence, the Court instead "may credit the stockholder's valuation purpose." *Id.* Plaintiffs' testimony persuades me that they do, in fact, seek to understand the status of the business and value of their interests, even if they have not identified a

---

[101] J. Gill at 222-23.

[102] AB at 23.

specific end use for that information.  As Plaintiffs explain, "Jag and Mitch are 46% members of a company that holds a significant portion of their net worth . . . .  Their reasons for wanting to value their interests are self-evident."[103]

Second, the Company contends that Plaintiffs do not actually seek to investigate wrongdoing.  According to the Company, prior to Jack's death, Plaintiffs regularly used Company assets to pay personal expenses, including personal tax liabilities.  The Company says that if Plaintiffs did not believe their own personal expenditures were wrongful, they cannot honestly believe that Jackie's payment of personal expenses is wrongful.  Plaintiffs disagree, claiming the "line of credit" used at the Airport Companies was different because it was "scrupulously tracked," and turn the Company's argument back on it, suggesting that if Jackie believes their prior draws were wrongful, then she must concede her own are as well.  To my mind, these arguments simply confirm the parties' mutual distrust, and I remain convinced that Plaintiffs sincerely seek to investigate the legitimacy of any personal payments Jackie has authorized.

Third, the Company argues that the Demand itself demonstrates that Plaintiffs' true purpose is not to investigate wrongdoing or to value their interests in the Company, but to investigate Regency's ability to continue financing the

---

[103] RB at 12.

litigations in the U.K. and Texas, and to improperly obtain discovery to advance those other lawsuits. The Company asserts that the Demand seeks records and details of payments to the Company's legal advisors; the Demand requests communications with the Company's accountant, Perry Patel, that Plaintiffs were denied during discovery in the U.K. litigations; and, despite arguing here that the transfers from Northwest Airport to West Properties "made no sense," Jag represented in the Texas litigation that the transfers were used to pay litigation expenses. On that last point, the Company says that "inconsistency" proves Plaintiffs "are attempting to conceal here that their true purpose in bringing this action is to acquire highly confidential information about Regency's current and continuing willingness and ability to fund its litigation with Mitch and Jag, and the course of Regency's confidential investigations in support of its claims and defenses."[104]

Plaintiffs deny that the Demand was prompted by any desire to obtain an advantage in the other litigations. The timing of the Demand supports that conclusion. Plaintiffs sent their initial demand to the Company on May 24, 2022, days after Jag discovered the $600,000 and $170,838.71 personal payments, and a few weeks after he began to see transfers from Northwest Airport to West Properties.

---

[104] AB at 19.

45

As Plaintiffs explain, "[t]his was well after the parties filed their now-consolidated hotel claims in 2021 . . . and well before they filed their second set of UK claims in September and October 2022."[105]

And, again, Plaintiffs' testimony about their purposes was credible. Mitch testified that "whether it's about the prosecution, whatever [Jackie]'s not able to share with me under privilege or whatever it may be, I'm not asking for that."[106] He said:

> I'm not sure what I'm asking for regarding the litigation. What I am asking you for is all the documents, all the paperwork, so that I can see how the companies are performing. I'm not necessarily trying to understand what her case is against me. I'm asking, how is the company performing? As an owner, I have that right.[107]

Weighing the evidence, I find it implausible that Plaintiffs, who believe they collectively own 46% of the Company yet no longer have any insight into its operations, are primarily motivated by gaining a litigation advantage as opposed to actually understanding the status of the business, the value of their interests, and whether Jackie is self-dealing.[108]

---

[105] RB at 21 (citing JX 50, JX 55, JX 62, and JX 64).

[106] M. Gill at 100.

[107] *Id*. at 101-2.

[108] The Company relies on *Berkowitz v. Legal Sea Foods, Inc*., 1997 WL 153815 (Del. Ch. Mar. 24, 1997), in which the Court found that a stockholder of a private, family-run

For these reasons, I find that the Company has not met its burden to prove by a preponderance of the evidence that Plaintiffs' actual, primary purposes for seeking books and records are other than those stated in the Demand.

### C. The Company Has Not Established a Good Faith Belief That Disclosing the Information Sought in the Demand Will Harm the Company.

Section 18-305(c) empowers the manager of a limited liability company to withhold books and records from the members where the manager believes in good faith that disclosure of information would not be in the best interests of the company or could damage the company or its business:

> ***The manager of a limited liability company shall have the right to keep confidential from the members***, for such period of time as the manager deems reasonable, any information which the manager reasonably believes to be in the nature of trade secrets or other ***information the disclosure of which the manager in good faith believes is not in the best interest of the limited liability company or could damage the limited liability company or its business*** or which the limited liability company is required by law or by agreement with a third party to keep confidential.

---

company sought books and records for the primary purpose of "facilitat[ing] the prosecution" of claims in a Massachusetts lawsuit. But in that case, unlike here, "the plaintiff . . . made no real effort to advocate his position in any credible way," and instead "filed an eight page posttrial brief that advanced essentially conclusory assertions, and made no effort to address the factual or legal problems inherent in his case." *Id*. at *3. Of course, the Court's factual findings in that case do not control here.

6 *Del. C.* § 18-305(c) (emphasis added).[109]

Relying on this section, the Company asserts that even if the purposes stated in the Demand are Plaintiffs' actual, primary purposes, the Company may refuse to permit inspection because Jackie, as a manager of the Company, believes in good faith that "allowing any part of the requested inspection would have both the purpose and effect of providing Mitch and Jag with a strategic and tactical advantage in their multiple lawsuits against Regency."[110] According to the Company, Plaintiffs "are using funds they took from the Regency companies to fund a barrage of litigation in the hope that the companies, drained of cash, will be unable to fund a defense," and "[t]he financial records they seek here would reveal just how well their strategy is working and how much longer they will need to sustain it."[111] The Company asserts that "even the most basic financial records would indicate the legal spend," and "information about the companies' free cash flow, savings, and credit lines would give Mitch and Jag unprecedented insight into Regency's ability to resist their siege of lawsuits."[112]

---

[109] At trial, Plaintiffs argued for the first time that the Operating Agreement supersedes Section 18-305(c). That argument was not briefed and is therefore waived. *See Emerald Partners*, 726 A.2d at 1224.

[110] AB at 14.

[111] *Id.* at 15.

[112] *Id.* at 15-16.

The Company bears the burden to prove Jackie's good faith belief that disclosing any information sought in the Demand would not be in the best interest of the Company. *Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*, 746 A.2d 842, 846 (Del. Ch. 1999). The Company has not met that burden.

When asked what harm the inspection would cause, Jackie testified that expedited litigation is "burdensome" and Plaintiffs face "conflicts of interest" due to the pending litigations.[113] She also explained that inspection should be denied because only the person "who's running the business" should be the one "looking at" the Company's finances—she testified that "I don't think as an owner, everyone needs to be doing that."[114] In response to leading questions on direct examination, Jackie did confirm her agreement that the Company's subsidiaries would not "benefit" from Plaintiffs learning how much has been spent on the litigation and how much cash remains available to fund it.[115] But that testimony did not convince me

---

[113] J. Kaur at 262-63.

[114] *Id*. at 161.

[115] *Id*. at 263 ("Q. [I]f Mitch and Jag knew how much Transomas was spending on the litigation, would that be a benefit to Transomas? A. I don't think so."); *id*. at 264 ("Q. Do you want Mitch and Jag to know how much you're spending or Transomas is spending on its attorneys in the UK litigation? A. No, I don't think that's appropriate in litigation. I'm not aware of any situation where that's allowed in litigation. So I think claiming an interest that would give you something that's an unfair advantage in litigation that you're choosing to pursue or defending, wouldn't be appropriate."); *id*. at 266 ("Q. [C]an you . . . think of anything that would become good for Transomas Investments by Mitch knowing how

that Jackie sincerely believes providing Plaintiffs with access to books and records would not be in the best interests of the Company for the reasons that counsel asserts.

This conclusion is supported by the Company's failure to even attempt to identify, with any precision, the information that, if disclosed, would harm the Company. Jackie testified that she was "not sure which specific books are being sought here."[116] And counsel conceded at trial that some information sought in the Demand—such as information reflecting interested-party transactions—would not reveal the Company's legal spend or ability to fund the litigations going forward. Yet in an effort to wholly resist the Demand, the Company argues that "allowing *any part* of the requested inspection" would cause harm and refuses to produce, in its own words, "even the most basic financial records."[117] I find this position was not asserted in good faith.

---

much it's spending on the litigation in London? . . . A. No, I think it's contrary to the interests of Transomas Investments, Limited. I can't think of how that would be helpful to the interests of the company."); *id*. at 267 ("Q. Do you think there's any benefit that you can think of to Transomas, Limited of Mitch and Jag knowing how much cash flow is available to fund litigation against Mitch and Jag and their companies in all the litigation they brought and has been brought against them? . . . A. No, I don't think it would be of any benefit to the company. I think it would be contrary to the best interest of the company.").

[116] *Id*. at 185.

[117] AB at 14, 16 (emphasis added).

Beyond that, the purported harm the Company claims to face is overblown.[118] It is no secret that the Company has incurred substantial legal expenses.[119] By making the argument, the Company seems to concede that its litigation spend is unsustainable. While I do not entirely discount the advantage Plaintiffs could gain by understanding the Company's financial position, any incremental leverage does not outweigh Plaintiffs' right to obtain books and records for the proper purposes stated in the Demand.[120]

Accordingly, the Company has not met its burden to support its defense under Section 18-305(c) and cannot withhold documents on that basis.

---

[118] *See* AB at 16 ("If litigation were war, such disclosure to the enemy of one's resources available for the fight would be considered treason.") (citing CONVENTIONAL AMMUNITION IN SURPLUS 9 (James Bevan, ed., 2008), for the proposition that "ammunition stockpiles are regarded as national secrets").

[119] M. Gill at 79 ("Q. So you are, of course, well aware that the Regency subsidiaries have substantial legal expenses in the . . . UK, right?"); AB at 15 (arguing that "[t]he financial records [Plaintiffs] seek here would reveal" whether "the companies, drained of cash, will be unable to fund a defense"); *id.* at 15-16 ("[T]he size of the legal fees relative to the normal expenses of the Transomas companies are such that even the most basic financial records would indicate the legal spend"); *id.* at 18-19 ("Mitch and Jag admit that it is pretty obvious why Regency would need substantial sums transferred from the airport to its UK subsidiaries: to fund the expenses of the 'English Proceedings'").

[120] *See Kortum v. Webasto Sunroofs, Inc.*, 769 A.2d 113, 124 (Del. Ch. 2000) (noting that when stockholders seeking inspection own a large percentage of a privately held company, "there often is no identifiable corporate interest separate and apart from the interests of the . . . stockholders or if there is, the interest of the corporation in protecting itself from unwarranted intrusion is considerably diminished").

## D. Scope of Production

Because Plaintiffs have established a right to inspection, I address the scope of the Demand.

Section 18-305(g) provides that "[i]f a member is entitled to obtain information under this chapter or a limited liability company agreement for a purpose reasonably related to the member's interest as a member or other stated purpose, the member's right shall be to obtain such information as is necessary and essential to achieving that purpose." 6 *Del. C.* § 18-305(g). The Company has not argued that any specific categories of information sought in the Demand are not necessary and essential to Plaintiffs' stated purposes,[121] and it does not contest that, if inspection is ordered, Plaintiffs are entitled to books and records held by Regency's subsidiaries in the U.K.

The Demand seeks six categories of books and records and five additional categories of information from the Company. Those specific requests can be grouped into three broader categories: requests for financial documents (Document Requests 1-5 and Information Requests 3 and 4); requests concerning interested-

---

[121] As a result, the Company has waived any objection to the scope of the relief recommended herein on the basis that any particular documents are not necessary and essential to the purposes stated in the Demand. *See Emerald Partners*, 726 A.2d at 1224.

party payments and transactions (Information Requests 1-2 and 5); and requests for correspondence with the Company's accountants (Document Request 6).

## 1. Financial Documents

Document Requests 1 and 5 and Information Request 4 seek financial statements, profit and loss statements, and general ledgers; copies of tax returns; and documents reflecting the Company's current assets and liabilities. These documents are necessary and essential to Plaintiffs' valuation purpose.

Document Requests 2, 3, and 4 seek all loan accounts; copies of all bank and account statements; and copies of all payroll records. Plaintiffs have not satisfied their burden to demonstrate that this granular information is essential to their valuation purpose.[122]

Information Request 3 seeks documents reflecting all payments made to the Company's accountants, legal advisors, and other professional advisors. This request is overbroad. "A request for all documents concerning any payment made to any advisor is more akin to discovery in plenary litigation than a [books and

---

[122] *See* J. Gill at 219 (requesting bank account statements for "more detail"). *See also Bizzari v. Suburban Waste Servs., Inc.*, 2016 WL 4540292, at *7 (Del. Ch. Aug. 30, 2016) (finding plaintiff failed to prove that requests for "monthly cash flow statements, all sales and expenses, credit, security, and pledge agreements, schedules of accounts payable and accounts receivable, check registers, and bank statements would aid in valuing his interests beyond the aggregate information contained in [the company's] financial statements").

records] request." *Woods*, 238 A.3d at 902. Plaintiffs are entitled to documents showing the total amount of payments made annually to each advisor.

### 2. Documents Concerning Interested-Party Payments and Transactions

Information Requests 1, 2, and 5 seek documents showing whether any loans have been advanced to Jackie, Amarjit, or other related parties; payments, distributions, or dividends paid to or made on behalf of or to Jackie, Amarjit, or related parties; and any related-party transactions undertaken by the Company. As noted above, whether stated as a valuation purpose, investigation purpose, or its own independent purpose, Plaintiffs are entitled to information reflecting "basic information about how [the Company's managers] are compensated" and "how their fiduciaries are taking money out of the corporation." *Woods*, 238 A.3d at 900-01. These requests are appropriately tailored to the purposes of the Demand.[123]

### 3. Correspondence with the Company's Accountants

Document Request 6 seeks all correspondence with the Company's accountants, Perry Patel and Silver Levene. This information may be relevant to Plaintiffs' valuation purpose, and could also bear on Plaintiffs' investigation purpose to the extent communications refer to interested-party transactions. However, the

---

[123] To the extent payments to Jackie are reflected on payroll records (*see* Document Request 4), those must be produced as well.

documents discussed above are sufficient for those purposes, and Plaintiffs have not demonstrated a need for informal communications. I therefore recommend that this request be denied.

**E.    Plaintiffs' Request to Amend the Pleadings Should be Denied.**

Plaintiffs seek to amend their pleadings to the evidence, pursuant to Court of Chancery Rule 15(b), to add a request for "the Regency Companies' governing documents, including any limited liability company agreements, resolutions, transfer agreements, ownership ledgers, or other foundational documents that have been created or amended since April 2020."[124] As of trial, Plaintiffs had not served a written demand seeking those documents. Because a demand for books and records must strictly comply with the form and manner requirements of Section 18-305, I recommend that Plaintiffs' request be denied, but nothing herein precludes Plaintiffs from serving another demand on the Company.

Relatedly, Plaintiffs "conditionally" move for fees in the event that Regency's document productions reveal that it has engaged in "self-help" by amending its governing documents.[125] At trial, Plaintiffs' counsel confirmed that Plaintiffs are

---

[124] OB at 49.

[125] *Id*. at 55-56.

not asking the Court to rule on that request at this time. It may be renewed when and if appropriate.

## III. CONCLUSION

I recommend that judgment be entered for Plaintiffs as described above. The parties should meet and confer regarding a form of order memorializing the scope of the production. This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144(d)(2). The stay of exceptions entered under the Chancellor's April 4, 2023 letter is hereby lifted.